# UNITED STATES DISTRICT COURT FOR THE

# SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **C.A.** through their next friend P.A., **C.B.** through his next friend P.B., and **C.C.** through his next friend P.C., for themselves and those similarly situated,<br><br>   **Plaintiffs,**<br><br>   **v.**<br><br>**Kelly Garcia**, in her official capacity as Director of the Department of Health and Human Services,<br><br>   **Defendant.** | C/A No. _____ |

# COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ...................................................................................................................... 4

    I.      The Named Plaintiffs ................................................................................. 4

          A.      Plaintiff C.A. .............................................................................. 5

          B.      Plaintiff C.B. .............................................................................. 8

          C.      Plaintiff C.C. ............................................................................ 12

    II.     The Defendant ............................................................................................ 15

STATEMENT OF FACTS .......................................................................................... 16

    I.      Statutory Background ............................................................................... 16

          A.      The Federal Medicaid Act and the Early and Periodic Screening, Diagnostic, and Treatment Services (EPSDT) Mandate .......................... 16

          B.      The ADA, the Integration Mandate, and Section 504 of the Rehabilitation Act ....................................................................... 18

          C.      Iowa's Implementation of Medicaid ......................................... 21

    II.     The State of Iowa Has Long Disregarded the Lack of Mental and Behavioral Health Services for Medicaid-Eligible Children. .................................................. 23

    III.    Defendant Fails to Provide Intensive Home and Community-Based Services to Plaintiff Children. ....................................................................................... 28

          A.      Defendant Fails to Provide Necessary Intensive Care Coordination...... 30

          B.      Defendant Fails to Provide Necessary Intensive In-Home Therapeutic Services. ..................................................................... 34

          C.      Defendant Fails to Provide Necessary Crisis Response Services............. 36

**D.**     **Plaintiffs Risk Segregation, Lack of Integration in the Community, and Unnecessary and Harmful Institutionalization.** .......................................... 38

**E.**     **Defendant Administers the Medicaid Program Using Discriminatory Methods, Including Failure to Monitor, Identify the Need for Corrective Action, and Take Remedial Measures.** ....................................................... 40

**CLASS ALLEGATIONS** ....................................................................................... 42

**CLAIMS FOR RELIEF** ......................................................................................... 47

**FIRST CAUSE OF ACTION** ............................................................................ 47

**SECOND CAUSE OF ACTION** ....................................................................... 48

**THIRD CAUSE OF ACTION** .......................................................................... 48

**FOURTH CAUSE OF ACTION** ...................................................................... 51

**PRAYER FOR RELIEF** .................................................................................... 52

## NATURE OF THE CASE

1.      Plaintiffs are Medicaid-eligible children with a serious emotional disturbance who need intensive home and community-based services to treat or ameliorate their mental and behavioral health conditions. This class action arises from the Iowa Department of Health and Human Services' longstanding failure to provide the Plaintiff children with these legally-required and medically necessary services. For years, Iowa officials have publicly acknowledged the inadequacy of the State's mental health system for children. Yet, despite repeated calls to address these concerns, necessary services remain unavailable. Plaintiffs bring this action on behalf of themselves and all similarly-situated children against Defendant Kelly Garcia, in her official capacity as Director of the Iowa Department of Health and Human Services.

2.      In the absence of intensive home and community-based services, Plaintiff children risk deteriorated mental health, escalating treatment needs, mental health crises, suicidal ideation, self-harm, hospitalizations, and repeated institutionalization in psychiatric facilities and other restrictive settings, where these children are separated from their parents, families, schools, friends and other community supports. They decline socially and academically. The State's inadequate mental and behavioral health system is disproportionately affecting youth from low-income families, LGBTQIA+ youth, and youth of color.

3.      When provided, intensive home and community-based services can enable children with a serious emotional disturbance to live in community settings and participate in family and community life, including in childhood activities such as school, sports, hobbies, and social activities. Home and community-based care improves outcomes for children with serious emotional disturbances, and it also is far more cost-effective.

1

4.      Under the Early and Periodic Screening, Diagnostic, and Treatment Services (EPSDT) provisions of the Medicaid Act, Defendant must provide or arrange for mental and behavioral health services for Medicaid-eligible children under age twenty-one when these services are necessary to correct or ameliorate their conditions. The Medicaid Act also requires Defendant to arrange for these services to be provided with reasonable promptness. Under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, Defendant must provide Medicaid services in the most integrated setting appropriate to meet the Plaintiff children's needs.

5.      Despite these legal requirements, Defendant fails to meet her statutory obligations with regard to the following intensive home and community-based services for Plaintiff children for whom such services are medically necessary:

        **(a) Intensive Care Coordination** – case management and planning services to develop an individualized care plan together with the child, family, and care team, and that coordinates care across multiple systems, assists the family in accessing and arranging for services, advocates for the child and family, monitors progress, and ensures transition planning.

        **(b) Intensive In-home Therapeutic Services** – interventions that are individually tailored to the needs of the child, delivered to children and families in their homes and other community settings, and provided with sufficient frequency and consistency, to improve youth and family functioning and prevent out-of-home placements. These services include individual and family therapy by a licensed clinician, behavioral interventions, and skills training.

        **(c) Crisis Response Services** – emergency services, including mobile crises and crises stabilization, available 24/7 to respond to a child's acute mental health needs quickly,

in the home or community, de-escalate emergencies, and prevent unnecessary out-of-home placements or hospitalizations.

6.      The Defendant's ongoing failures to provide or arrange for these services violates the EPSDT and the Reasonable Promptness provisions of the Medicaid Act, Title II of the ADA, and Section 504 of the Rehabilitation Act. Plaintiffs seek declaratory and injunctive relief to address these ongoing violations. Plaintiffs do not seek monetary damages.

## JURISDICTION AND VENUE

7.      This action is brought under 42 U.S.C. § 1983 because the Defendant, acting under the color of state law, has deprived the Named Plaintiffs, and the members of the class they represent, of rights secured by federal statutory law.

8.      This action arises under the Medicaid Act, Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. § 2201 and § 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant maintains principal offices within this district, in Des Moines, Iowa, and because at least one of the Named Plaintiffs resides in this district.

## PARTIES

I. **The Named Plaintiffs**[1]

10.    The Named Plaintiffs are Medicaid-eligible children in the State of Iowa under the age of twenty-one who (a) have a serious emotional disturbance, not attributable to an intellectual or developmental disability, and (b) for whom a licensed practitioner of the healing arts has recommended intensive home and community-based services to correct or ameliorate their conditions. They seek to represent a class of all similarly situated children (the Class).

11.    Serious emotional disturbance is defined as a "diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria specified within the most current diagnostic and statistical manual of mental disorders published by the American psychiatric association that results in a functional impairment." Iowa Code § 225C.2.[2]

12.    The Named Plaintiffs and members of the Class have a disability. A disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108.

13.    The Named Plaintiffs and members of the Class are qualified individuals with a disability who meet the essential eligibility requirements for the services they seek, have been

---

[1] Plaintiffs are simultaneously filing a motion to proceed using pseudonyms. This complaint uses pseudonymous initials to refer to the Named Plaintiffs and their parents, the Next Friends.

[2] Under Iowa Code, a serious emotional disturbance does not include substance use or developmental disorders, unless those disorders co-occur with such a diagnosable mental, behavioral, or emotional disorder. *See also* Substance Abuse and Mental Health Services Administration, DSM-5 Changes: Implications for Child Serious Emotional Disturbance, (June 2016), at 8, https://www.samhsa.gov/data/sites/default/files/NSDUH-DSM5ImpactChildSED-2016.pdf.

recommended for community-based treatment by a licensed professional, and want to receive those services in the most integrated setting appropriate to their needs.

14.     Each of the Named Plaintiffs is either currently or previously segregated from their community, currently or previously unnecessarily institutionalized at a mental health facility, or is at risk of segregation or unnecessary institutionalization in a mental health facility, where they are deprived of community integration, because sufficient intensive home and community-based services are not available through Iowa's Medicaid program.

**A.  Plaintiff C.A.**

15.     C.A. is a 13-year-old Medicaid recipient from Polk County, Iowa who is diagnosed with multiple mental and behavioral health conditions and determined to have a serious emotional disturbance. As a result of Defendant's failure to provide or arrange for medically necessary intensive home and community-based mental health services, C.A. has cycled through repeated hospitalizations and in-patient facilities, and is currently placed in a residential treatment facility for these conditions. C.A. brings this action through their mother, P.A. C.A. has not received the intensive home and community-based services that they need and to which they are statutorily entitled.

16.     C.A. loves art, math, swimming, dancing, and spending time with their dog. C.A. is extremely caring, and particularly likes to care for younger children. C.A. also enjoys music, and sings and plays music with their mother and sister.

17.     C.A. is diagnosed with numerous mental health conditions, including Major Depressive Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder (PTSD), Panic Disorder, and an eating disorder. C.A. suffered significant childhood trauma, including being sexually abused at a young age. C.A. has experienced symptoms of suicidal ideation and self-harming behaviors as a result of their diagnoses.

18.     Treating providers have determined that C.A. has a serious emotional disturbance and that their mental and behavioral health conditions substantially limit their functioning in family, school, or community activities. These impairments significantly impact their ability to learn, communicate, and care for themselves. They are a qualified individual with disabilities for the purposes of the ADA and Rehabilitation Act.

19.     Beginning in the fall of 2021, C.A.'s mental health deteriorated and they began experiencing suicidal ideation. In March 2022, C.A. was hospitalized after attempting to commit suicide by stabbing themselves with a screwdriver. C.A. sat in the emergency room for over 24 hours, with adult psychiatric patients, because hospital staff could not find an open bed at an appropriate facility. C.A. was eventually placed at a pediatric inpatient facility for four days.

20.     Upon discharge back to the community, necessary intensive home and community-based services were not provided for C.A. Instead, C.A. received only the same limited medication management and out-patient counseling that they had received prior to their hospitalization. Unsurprisingly, C.A. again deteriorated.

21.     Between March and June 2022, C.A. attempted suicide five additional times and each time was treated in the emergency room and/or placed in a residential facility. After each of these stays, C.A. returned home, again deprived of needed intensive home and community-based services. No discharge planning occurred for C.A. to receive these services.

22.     C.A.'s treating providers have recommended they receive intensive home and community-based mental and behavioral health services, including individual therapy, skills training, and care coordination. However, C.A. has not received the services that are medically necessary to treat or ameliorate their conditions.

23.     For example, despite their repeated suicide attempts and significant need for crises services, C.A. never received the crises services necessary to meet their needs. C.A. never received any mobile crises services. Although C.A. was recommended to access mobile crises services and told to call a mental health crises line if needed, when C.A. did call this line or attempt to access crises services, they were instead repeatedly instructed to go to the emergency room. At the emergency room, staff indicated that they did not have specialists able to provide the pediatric mental health services C.A. needed. C.A. and their family found these emergency room stays to be traumatic.

24.     C.A. also never received necessary intensive in-home therapeutic services. For example, C.A. never received in-home therapy. And although C.A. sought, in late May 2022, to receive home and community-based skills training,[3] they waited for a month to receive these services, during which time their mental health deteriorated and they were placed in a restrictive residential placement.

25.     Additionally, C.A. did not receive the intensive care coordination that was medically necessary. While C.A.'s mother discovered and applied for Iowa's limited care coordination program on her own, on or about May 2022, this program did not actually provide C.A. with intensive care coordination services, as Iowa does not provide such services. The provider did not provide C.A. or their family with family and team planning, intensive assessment or coordination of services, or transition planning, which are required components of intensive care coordination. It was C.A.'s mother, not the provider, who found and applied for the limited

---

[3] Skills training for C.A. and the other Named Plaintiffs was to be provided through Iowa's Behavioral Health Intervention Services (BHIS) program, described in more detail in Section III.B *infra*.

services that were available, and who struggled to navigate the complicated mental health system on her own.

26.     Eventually, by late June 2022, C.A.'s mental health had deteriorated to the point that their medical providers determined they needed long-term residential care. After five weeks waiting for an open bed, they were placed in a Psychiatric Medical Institution for Children. As of the date of filing, C.A. remains in this restrictive placement.

27.     Because C.A. has not received intensive home and community-based services necessary to meet their medical needs, their mental health has deteriorated, they have increasingly struggled in their interactions with others, and they have cycled through traumatic hospitalizations and in-patient stays. Relegated to residential placements at various different facilities, they have been unable to continue attending their school and have been repeatedly removed and segregated from their home, community, friends, family, and life activities.

28.     Without necessary services, C.A. remains unnecessarily institutionalized and currently resides in a residential treatment facility several hours away from their family.

29.     Intensive home and community-based mental health services are appropriate and needed for C.A. They and their family desire to receive intensive mental health services in their home and in other community-based settings.

30.     Pursuant to Fed. R. Civ. P. 17(c), Plaintiff C.A. appears through their mother, P.A.

**B.  Plaintiff C.B.**

31.     C.B. is a 15-year-old Medicaid recipient from Northwest, Iowa, who has been diagnosed with multiple mental and behavioral health conditions and determined to have a serious emotional disturbance. C.B. has never received the intensive home and community-based services that he needs and to which he is statutorily entitled. He brings this action through his mother, P.B.

32.     C.B. loves sports, especially basketball, football, and baseball. He loves to build with Legos and listen to music. He is interested in history and learning about how people live differently around the world.

33.     C.B.'s mental and behavioral health conditions became evident when he was placed in foster care around the age of four. Before his adoption by P.B. and her partner at the age of six, he experienced trauma and neglect. C.B. has been diagnosed with Disruptive Mood Dysregulation Disorder, Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder (ADHD) Combined, Anxiety, Reactive Attachment Disorder, and Post-Traumatic Stress Disorder (PTSD).

34.     Treating providers have determined that C.B. has a serious emotional disturbance and that his mental and behavioral health conditions substantially limit his functioning in family, school, or community activities. These impairments significantly impact his ability to learn, communicate, and care for himself. He is a qualified individual with disabilities for the purposes of the ADA and Rehabilitation Act.

35.     Treating providers have recommended that C.B. receive intensive home and community-based services but he has not received the services that are medically necessary to correct or ameliorate his conditions, including intensive in-home therapeutic services and intensive care coordination.

36.     For example:

i.   In 2015, a treating provider recommended that C.B. receive home and community-based mental health services including coping skills-building and family skills training. Additional practitioners recommended cognitive behavioral therapy, evidence-based interventions targeting attachment and family

functioning, in-home services for adaptive functioning skills, including anger
management and emotional regulation in 2020 and trauma therapy in 2022.

ii.   It was not until over four years after the initial 2015 recommendation that C.B.
began receiving limited skills training in April 2020.

iii.   In August 2022, these services stopped and C.B. was again on a waitlist for over
three months before these limited services were reestablished.

iv.   For years, C.B. has needed intensive care coordination before he began to receive
limited care coordination in 2022. However, this was not the intensive care
coordination he needed, as Iowa does not provide intensive care coordination.
The workers have merely called monthly to check in and briefly visited the family
quarterly. C.B. received no assistance with access to services or intensive care
coordination across providers. As of the date of filing, he has been assigned to
three different care coordination providers in the past eight months.

37.   The State's failure to provide or arrange for intensive home and community-based
services has caused C.B.'s condition to deteriorate, resulting in repeated segregation, lack of
community integration, and institutionalization for his mental and behavioral health conditions.
For example, in May 2020, C.B. was admitted to an in-patient facility for a seven-day stay after
he exhibited aggressive behavior and was determined to be a risk to others. In August 2021, C.B.
was admitted to a Psychiatric Medical Institution for Children, where he was then institutionalized
for five months.

38.   C.B. returned home in each instance without receiving the intensive home and
community-based mental health services that he needs to function and remain in the community.
Three months before C.B. was discharged from the Psychiatric Medical Institution for Children,

staff recommended that individual and family therapy, medication management by a psychiatrist, skills training, and care coordination services be in place prior to his discharge. After he was discharged in the first week of February 2022, an outpatient provider again recommended skills training. The limited skills training and care coordination that C.B. eventually received did not include the necessary components of intensive home and community-based services.

39.     C.B.'s mother, P.B., has repeatedly sought to secure intensive home and community-based services to keep C.B. safe and at home in the most integrated setting possible.

40.     When C.B. has received the limited services that have been available, such as a full-day program combining therapy, skill development and respite care he received for a few months during the summer of 2022, his behaviors showed improvement and he was able to more fully participate in the community. When this program ended in mid-August 2022, his parents were forced to take time off work or to work from home in order to closely supervise him until the school year began. In the absence of intensive home and community-based services to support him, C.B. cannot be left unsupervised in the home. During the school year, his parents have arranged their work schedules such that he is never alone before or after school. During school vacations, his parents take time off work so that they can supervise him at home.

41.     Without the specified intensive home and community-based mental and behavioral health services, C.B. has repeatedly engaged in destructive, aggressive, and defiant behaviors. He is unable to develop and maintain friendships. He does not participate in any extracurricular or social activities, despite having an interest in playing sports and socializing with other youth his age. He struggles to maintain safe and appropriate boundaries and basic hygiene.

42.     C.B. is now living at home and is at risk of institutionalization and lack of community integration. His mental health has continued to deteriorate without the intensive home

and community-based services to which he is entitled. Because he has been unable to access those services from Defendant, C.B. will continue to be segregated from his community, his condition will likely deteriorate and harm his development and well-being, and he is at risk of becoming institutionalized.

43.     Intensive home and community-based services are appropriate and necessary for C.B. He and his family desire to receive such services in his home and in other community-based settings.

44.     Pursuant to Fed. R. Civ. P. 17(c), Plaintiff C.B. appears through his mother, P.B.

**C.  Plaintiff C.C.**

45.     C.C. is a 14-year-old Medicaid recipient from Polk County, Iowa, who has been diagnosed with multiple mental and behavioral health conditions and determined to have a serious emotional disturbance. He brings this action through his mother, P.C., who adopted C.C. when he was four years old. C.C. has struggled with mental and behavioral health conditions since the age of two and since then has never received the intensive home and community-based services that he needs and to which he is statutorily entitled.

46.     C.C. loves being active outside and playing baseball and basketball. He enjoys puzzles. He is sensitive and cares about others.

47.     Before C.C. was placed in foster care at two years old, he experienced trauma and neglect. C.C. has been diagnosed with multiple mental health conditions, including Attention Deficit Hyperactivity Disorder (ADHD) Combined, Anxiety, and Reactive Attachment Disorder. He has also been diagnosed with a sensory processing disorder.

48.     Treating providers have determined that C.C. has a serious emotional disturbance and that his mental and behavioral health conditions substantially limit his functioning in family, school, or community activities. These impairments significantly impact his ability to learn,

communicate, and care for himself. He is a qualified individual with disabilities for the purposes of the ADA and Rehabilitation Act.

49.     Without medically necessary intensive home and community-based mental and behavioral health services, C.C. exhibits self-harm by banging his head and biting himself, impulsivity and extreme anxiety. He is very afraid of being alone in a room. He is unable to develop and maintain friendships. His behaviors have taken a significant toll on his family's functioning and the mental health of his family members.

50.     In 2015, a treating provider determined that C.C. needed coping skills to help with his anxiety, to aid in his behavioral reactivity, to assist in the learning of social skills, and to regulate his behavioral affect. The provider recommended that achieving those be a combined effort between an individual therapist, possibly group social skills therapy, medication management, home and school positive behavior management, and family therapy. The limited services that C.C. has received have not met these medical needs.

51.     For example, C.C. has never received any intensive in-home therapeutic services. He has merely received limited skills training, but these did not include the services necessary to meet his medical needs. Moreover, since the summer of 2022, P.C. and local providers have been completely unable to locate someone to provide even these limited services.

52.     For years, C.C. has needed intensive care coordination to coordinate services and providers, but he has never received that service, as Iowa does not provide intensive care coordination. What limited care coordination he has received has been provided by a succession of four or five different care coordination providers who were serially provided to him. His care coordination workers did not participate in any family team planning process to coordinate care plans, nor did he receive any intensive service planning, monitoring, or follow-up.

53.     Without needed services, in September 2020, C.C. was admitted to a Psychiatric Medical Institution for Children after exhibiting inappropriate behaviors. At the time of his admission, he was not receiving the services he needed, and the admission occurred because of Defendant's failure to provide or arrange for adequate intensive home and community-based services for him. He was institutionalized there for five and a half months.

54.     Upon his discharge from the Psychiatric Medical Institution for Children, C.C. returned home without the intensive home and community-based services that he needs to function in the community. While it was recommended that C.C. continue with skills training and care coordination, C.C. did not receive the intensive home and community-based services that are medically necessary to correct or ameliorate his conditions.

55.     In the absence of the services he needs, C.C.'s condition continues to deteriorate, resulting in segregation and risk of additional institutionalization.

56.     C.C.'s mother, P.C., has repeatedly sought to secure intensive home and community-based services for him in order to keep C.C. at home in the most integrated setting possible.

57.     C.C. is now living at home and at risk of institutionalization and lack of community integration. He cannot be left unsupervised due to behaviors associated with his mental health diagnoses. His mental and behavioral health continues to deteriorate without the intensive home and community-based services to which he is entitled. Because he has been unable to access those services from Defendant, C.C. will continue to be segregated from his community, lacking in community integration, and his condition will likely deteriorate and harm his development and well-being.

58.     Intensive home and community-based services are appropriate and needed for C.C. He and his family desire to receive such services in his home and in other community-based settings.

59.     Pursuant to Fed. R. Civ. P. 17(c), Plaintiff C.C. appears through his mother, P.C.

## II. **The Defendant**

60.     The Iowa Department of Health and Human Services (DHHS) is the "single state agency" responsible for oversight of the Medicaid program in Iowa and for compliance with all federal requirements. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; Iowa Code §§ 249A.4, 217.1; Iowa State Plan Under Title XIX of the Social Security Act.[4]

61.     DHHS is a "public entity" subject to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1)(B), a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the federal regulations promulgated under those two statutes.

62.     Defendant Kelly Garcia is the Director of DHHS and, as such, is responsible for "[a]ll operations of the Department of Health and Human Services," including all "formulation of department policy," "establishing standards of performance," and "serving as the principal agent in all legal matters." Iowa Code § 441-1.1(17A). Defendant Garcia oversees Iowa's Medicaid program and has the responsibility to "make rules, establish policies, and prescribe procedures" to implement the state plan for medical assistance. Iowa Code § 249A. Defendant Garcia is sued in her official capacity only.

---

[4] The Iowa Department of Health and Human Services (DHHS) was formerly two separate agencies: the Department of Human Services (DHS) and the Iowa Department of Public Health (IDPH). The logistical integration of the two prior agencies is to be completed by July 1, 2023. *See* Iowa Health and Human Services Alignment, State of Iowa Department of Health & Human Services, https://hhsalignment.iowa.gov/?utm_medium=email&utm_source=govdelivery.

## STATEMENT OF FACTS

**I.**   **Statutory Background**

**A.**   **The Federal Medicaid Act and the Early and Periodic Screening, Diagnostic, and Treatment Services (EPSDT) Mandate**

63.   Medicaid is a joint federal and state program that provides federal funding to help states furnish medical assistance for low-income individuals and families. 42 U.S.C. § 1396-1. Participation is voluntary; however, once a state chooses to accept federal funding and participate in the Medicaid program, it must meet the minimum federal requirements set forth in the Social Security Act and its implementing regulations. 42 U.S.C. § 1396a(a).

64.   Iowa has chosen to participate in Medicaid. *See* Iowa Code §§ 249A.2(7), 249A.4, 217.1; Iowa State Plan Under Title XIX of the Social Security Act.

65.   A state that participates in Medicaid must submit and have approved by the Secretary of Health and Human Services a state plan for medical assistance. *See* 42 U.S.C. § 1396a. The state plan must designate a single state agency that is responsible for ensuring that the state's Medicaid program complies with all federal requirements. *See* 42 U.S.C. § 1396(a)(5); 42 C.F.R. § 431.10.

66.   While states may adopt managed care models of service delivery, and contract with private entities to arrange for and manage the delivery of health services through private provider networks, the state is still responsible for ensuring compliance with all relevant Medicaid requirements. 42 U.S.C. §§ 1396a(a)(5); 1396u-2; 1396a(a)(43). The state must ensure that the managed care organization (MCO) has the capacity to offer the full range of necessary services for Medicaid beneficiaries. 42 U.S.C. § 1396u-2(b)(5). The state must also ensure that the managed care organization complies with its contractual obligations and all federal and state laws. 42 U.S.C. §§ 1396b(m)(2), 1396u-2(b); 42 C.F.R. §§ 438.6(c); 438.100(a)(2); 438.228(a). Iowa currently

contracts with two MCOs to deliver mental health services to Medicaid-eligible children and youth.

67.     The Medicaid Act also requires states to provide services known as "Early and Periodic Screening, Diagnostic, and Treatment Services" (commonly referred to as EPSDT) for children under the age of 21 who are eligible for Medicaid. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B). Under the EPSDT provisions, states are required to provide screenings to identify children's mental and physical health needs, as well as arrange for treatment services necessary to correct or ameliorate a child's mental or physical health conditions. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43)(C); 1396d(a)(4)(B); 1396d(r)(1); 396d(r)(5).

68.     EPSDT is the "nation's largest preventative health program for children." H.R. 3299, 101st Cong. § 4213 (1989). The services that Medicaid programs must provide for eligible children are broader than those that are required for Medicaid-eligible adults.

69.     When services are necessary to correct or ameliorate a child's condition, the state must cover them through the Medicaid program if they fit within service categories listed in 1396d(a), even if they are not included in the state plan. 42 U.S.C. § 1396d(r)(5); 42 C.F.R. § 441.56(c). The intensive home and community-based mental and behavioral health services at issue here fit within 1396d(a) categories. These 1396d(a) categories include case management services, 42 U.S.C. §§ 1396d(a)(19), 1396n(g)), and rehabilitative services, 42 U.S.C. § 1396d(a)(13), including any "remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts . . . for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13)(C).

17

70.     Participating states must also inform all persons in the state who are under the age of 21 and eligible for medical assistance of the availability of EPSDT services. 42 U.S.C. §§ 1396d; 1396a(a)(43)(A).

71.     The Medicaid Act further requires states to furnish medical assistance "with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8); *see* 42 C.F.R. § 435.930(a). States "must set standards for the timely provision of EPSDT services which meet reasonable standards of medical [] practice" and "must employ processes to ensure timely initiation of treatment." 42 C.F.R. § 441.56(e).

**B.   The ADA, the Integration Mandate, and Section 504 of the Rehabilitation Act**

72.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *accord* 28 C.F.R. § 35.130.

73.     The Named Plaintiffs and members of the Class are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its regulations, 28 C.F.R. § 35.104. A disability is a "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108.

74.     The ADA recognizes that "society has tended to isolate and segregate individuals with disabilities" and that this "continue[s] to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The ADA authorizes the Department of Justice (DOJ) to promulgate regulations to implement Title II. 42 U.S.C. § 12134(a). Regulations implementing Title II of the ADA therefore require public entities to "provide services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R.

§ 35.130(d). An integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B. Public entities must also "make reasonable modifications in [their] policies, practices, and procedures" to avoid discriminating on the basis of disability, unless the public entity demonstrates that the modification would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

75.     Because the Medicaid program is a public entity, Medicaid services must be provided in the most integrated setting appropriate to an individual's needs. *Cf. ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 880 (S.D. Iowa 2021) ("Failing to provide disabled children with the 'most integrated setting' possible violates their rights under the ADA and the Rehabilitation Act.").

76.     The United States Supreme Court recognized, in the landmark decision of *Olmstead v. L.C.*, 527 U.S. 581, 607 (1999), that unnecessary institutionalization constitutes discrimination under the ADA and that states must "provide community-based treatment for persons with mental disabilities when 1) the State's treatment professionals determine that such placement is appropriate, 2) the affected persons do not oppose such treatment, and 3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."

77.     In *Olmstead,* the Supreme Court also interpreted the ADA's integration mandate and held that Title II prohibits unjustified segregation of people with disabilities. *Id.* at 600. In so holding, the Court emphasized that unjustified isolation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of

19

individuals including family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment." *Id.* at 600-01.

78.     In 2011, the DOJ issued a statement on enforcement of the integration mandate articulated in *Olmstead*. *See* U.S. Dep't of Justice, Civil Rights Division, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities         Act         and         Olmstead         v.         L.C.*         (June         22,         2011), http://www.ada.gov/olmstead/q&a_olmstead.htm (DOJ Statement). In reiterating that the "most integrated setting" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible," the DOJ describes those settings as follows:

> Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible.

*Id.* at 3 (footnote omitted). The integration mandate is applicable to situations "where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities." *Id.* The DOJ explains that, pursuant to *Olmstead*, "[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent." *Id.* at 5.

79.     In addition to requiring public entities to provide services in the "most integrated setting," the ADA regulations prohibit public entities from using "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. . . ." 28 C.F.R. § 35.130(b)(3).

80.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, imposes similar requirements on programs and activities that receive federal financial assistance. *See*, *e.g.*, 45 C.F.R. § 84.4(b)(2); 28 C.F.R. § 41.51(b)(3). Section 504 is consistently interpreted in tandem with the ADA and with similar requirements. *Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) ("Cases interpreting either the ADA or the Rehabilitation Act are applicable and interchangeable because the Acts are similar in substance." (internal quotation marks and citations omitted)).

### C.  Iowa's Implementation of Medicaid

81.     Iowa has elected to participate in the Medicaid program and shares the cost of providing Medicaid services to its population with the federal government.[5] To receive federal funding, Iowa has prepared a state plan for medical assistance (the State Plan) that details its obligations to state beneficiaries. DHHS serves as the "single state agency" responsible for implementing Iowa's plan for medical assistance and ensuring compliance with all federal requirements, including compliance by contractors such as managed care organizations. *See* Iowa State Plan; Iowa Code §§ 249A.4, 217.1.

82.     In 2016, Iowa transitioned its Medicaid program to a managed care model of service delivery. As of the date of filing, Iowa contracts with two MCOs to deliver mental health services to Medicaid-eligible children and youth: Amerigroup Iowa, Inc. and Iowa Total Care. These two MCOs are contractually obligated to deliver mental health services in accordance with the scope of Iowa's state legislative requirements, the Iowa Medicaid State Plan consistent with

---

[5] Iowa's Federal Medical Assistance Percentage (FMAP) for fiscal year 2023 is set at 63.13% (eff. Oct. 1, 2022 through Sept. 30, 2023). The FMAP rate is the federal government's share of most Medicaid expenditures. *See* DHHS Notice, 86 Fed. Reg. 67481 (Nov. 26, 2021), https://www.govinfo.gov/content/pkg/FR-2021-11-26/pdf/2021-25798.pdf.

Iowa's obligations under EPSDT, and all Centers for Medicare and Medicaid Services approved waivers. *See* MCO Contract-MED-16-018; MCO Contract-MED-20-001, at Section 3.2.8.5.

83.     The MCOs must also deliver specific enumerated mental health services that are medically necessary, including "outpatient therapy," which includes "family therapy and in-home family therapy"; "integrated health home mental health services and support"; "behavioral health intervention services"; "in-home behavioral management services"; and "crisis services" including "24 hour crisis response," "mobile crisis services," "crisis assessment and evaluation," "non-hospital facility based crisis service, and "twenty-three (23) hour observation." *See* MCO Contract-MED-16-018; MCO Contract-MED-20-001, at Section 3.2.8.5.

84.     In addition, the MCOs must "develop a network of appropriately credentialed behavioral health providers to assure the availability of services for both adults and children and to meet the general access requirements" described in the MCOs contracts. *See* MCO Contract-MED-16-018; MCO Contract-MED-20-001, at Section 6.3.3.

85.     Iowa has also elected to participate in a federal Medicaid waiver program that provides services for children, the 1915(c) waiver. This Medicaid waiver allows states to use federal match dollars to provide additional services that "complement and/or supplement the services" that should be available through the Medicaid State Plan. Waivers provide coverage of individuals or non-medical services that might otherwise not be covered. The 1915(c) waiver does not impact Iowa's statutory obligation to provide EPSDT services and does not provide the intensive home and community-based services that Named Plaintiffs and members of the Class are seeking.

86.     The 1915(c) waiver, which is referred to as the "Children's Mental Health Waiver," authorizes services, such as respite care, that are beyond the scope of EPSDT. Children are eligible

if they are diagnosed with a serious emotional disturbance and are at risk of institutionalization. Iowa Admin. Code r. §§ 441—83.122(249A)(1)-(3),  441— 78.52(2)-(5).[6]

87.    Iowa has also elected a 1915(i) State plan amendment to provide Habilitation for Mental Health that provides certain behavioral health services for those 16 years or older. Similar to the 1915(c) waiver, the services for beneficiaries under the age of 21 are provided in addition to services provided under EPSDT. The 1915(i) Habilitation for Mental Health program does not provide the services the Named Plaintiffs and Class are seeking.

## II.    The State of Iowa Has Long Disregarded the Lack of Mental and Behavioral Health Services for Medicaid-Eligible Children.

88.    The Defendant has long recognized that no semblance of a children's system exists for mental health services in Iowa, particularly for Medicaid-eligible children with significant mental health needs who are at risk of institutionalization and lack of community integration. Despite the statutory requirements of the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act, as well as repeated calls from multiple entities over many years to repair these deficiencies, necessary action has not been taken.

89.    More than seven years ago, in October 2015, the Coalition for a Children's Mental Health Redesign in Iowa (the Coalition), released a report documenting the desperate need to "build a statewide children's mental health system that includes an array of effective services." The Coalition—made up of individuals and organizations with expertise and lived experience in the area of children's mental health—explained Iowa's long history of failing to develop and fund a system of care for children's mental health and the State's disregard of recommendations by

---

[6] The 1915(c) waiver is capped at 1,339 children. As of November 2022, 803 children sat on a waiting list to receive services under the Waiver program. The waitlist is one year long. *See* DHS, 2022  Monthly  Slot  and  Waiting  List  Summary  (updated  11/9/2022), https://dhs.iowa.gov/sites/default/files/11.9.22_Monthly_Slot_and_Wait_list_Public.pdf?121920 222027.

mental health advocates. The report specifically highlighted the need for community-based services to ensure that "[f]amilies of children with serious mental illness will have the support and resources necessary to allow them to keep their children at home in the community."

90.     The Coalition also recognized the need for accountability to ensure the provision of such services, calling for Iowa to "develop a set of outcome measures to assess the state of children's behavioral and emotional health in Iowa" and make this information "accessible and transparent" to the public. Finally, the Coalition called for oversight of the private MCOs, asking the State to "ensure that every Managed Care Organization that it contracts with to provide Medicaid services is in compliance with this and other Federal Laws, as the state is accountable despite these contracts."

91.     In 2017, the Chair of NAMI Iowa Children's Mental Health Committee reiterated in a presentation on mental health services that there was "[n]o point of accountability" for children's mental health. The Chair concluded with a "call to action," decrying the "[p]ast history of a lot of talk and little action."

92.     A consumer survey of Iowa Medicaid Managed Care enrollees in 2017 revealed that 75% of members who reported limited access to care provided written comments regarding difficulty accessing providers who accepted Medicaid. These parents expressed a particular need for additional mental and behavioral health services for their Medicaid-eligible children.

93.     In January 2018, the Iowa Legislature's Children's Mental Health and Well-Being Committee warned that, still, "[t]here is no children's mental health and wellbeing system in Iowa. Instead, children with mental health and other challenges have been served by cobbling together disconnected services, resources and knowledge." The Committee concluded that Iowa should

24

have a children's mental health system that "ensures children have access to a core set of required services and supports provided at a local level," whether a child is in severe crisis or at-risk.

94.     In February 2018, the Committee reiterated its earlier warning:

Iowa has no point of responsibility for a children's system. While a large number of community entities contribute to the enhanced mental health and well-being of children and families, none of them has the authority or financial responsibility to ensure children and families receive prevention services, treatment services, and the supports they need. Children are being served by disconnected services and fragmented resources.

95.     The Committee concluded that there was a critical absence of trauma-informed services, supports, and crisis response for children with complex needs, and that the State must address all level of care needs from prevention through crisis.

96.     A year later, in February 2019, the Iowa Legislature's Health and Human Services Appropriations Subcommittee announced in a presentation on children's mental health services that current systems remained "inadequate to address Iowa's children's mental health needs."

97.     Discussing its 2019 review of services within the Medicaid system, the Iowa Mental Health and Disability Services Commission (MHDS Commission), a body statutorily mandated to advise state leadership on state mental health and disability services, reiterated ongoing concerns with Medicaid mental and behavioral health services provided through the State's MCOs. These included that mental health providers were understaffed, behavioral health services "have a more difficult time getting reimbursement from the MCOs than physical health services," mental health providers faced delayed and partial payments, there are procedural and financial barriers to providing integrated care and there is confusion over administrative requirements for care coordination providers. The MHDS Commission explained that these concerns remain similar to

concerns reported in 2018 and that it was "frustrated that we have not seen significant progress [on these issues]." The MHDS Commission urged the Department of Human Services to address them.

98.      In August 2020, the Children's Behavioral Health System State Board (Children's Board), responsible for the establishment of a statewide children's mental health system (Iowa Code 225C), determined that "IF there is a comprehensive, statewide behavioral health system in place and successfully implemented, THEN there will be a corresponding improvement in the social-emotional-behavioral health of Iowa's children." The Children's Board identified as a "long term result" that "[a]ll children receive a behavioral health screening" and that "[a]ll children are free of impairment from un-addressed behavioral health concerns or issues."

99.      In May 2021, a working group of the Children's Board addressed ongoing mental health workforce shortages and identified continuing barriers to developing a sufficient service array in the children's mental health system. These included "Medicaid reimbursement rates for psychiatric services and behavioral health providers" and "low wages as a result of low Medicaid reimbursement rates."

100.     In December 2021, the Children's Board again cited the need to "[p]rioritize critical workforce needs in all levels of behavioral healthcare statewide." It reported that "gaps continue to exist in the Children's [mental health] System," citing the need, among other things, to "correct gaps in services that currently hamper effective care"; "service growth to all areas of the state"; "[p]rioritize critical workforce needs"; "eliminate the Children's Mental Health Waiver waitlist"; and "develop and implement statewide data collection pertaining to children with a serious emotional disturbance."

101.    In March 2022, a report by the Children's Board on children's mental health lamented that "[a]ll of these years later, there are still children sitting in emergency rooms for hours and days because there are not safe places for them to go."

102.    Despite full awareness of the need for improving children's access to mental and behavioral health services, Defendant's responses have been woefully inadequate. Defendant has failed to provide any meaningful oversight, accountability, or actual change. Despite the passage in 2019 and 2021 of legislation at least nominally aimed at children's mental health services, Medicaid-eligible children and families are still unable to access legally required and medically necessary intensive home and community-based mental and behavioral health services.

103.    The need for mental and behavioral health services among Iowa's children is at crisis levels. A 2021 study of Iowa youth, prepared by the Iowa Department of Health, found that over the past twelve months, "[b]etween 27% and 36% of students, depending on the grade, reported they had felt 'so sad or hopeless almost every day for two weeks or more in a row' that they stopped doing some usual activities." Between 17% to 24% of students reported having thought about killing themselves over the past twelve months. Approximately half of the students who had thought about killing themselves had formulated a plan, with 47% of sixth graders, 54% of eighth graders, and 49% of eleventh graders with suicidal ideation reporting they had formulated a plan. Nearly a quarter had made a suicide attempt.

104.    Students who identify as racial minorities, LGB+, and female in particular expressed disproportionate levels of poor mental health and suicide-related thoughts and behaviors. For example, 55% of LGB+ students in Iowa indicated they had thought about killing themselves in the past twelve months, and 67% reported feeling "so sad or hopeless almost every day for two weeks or more in a row" that they stopped doing some usual activities. A more recent

2022 survey by The Trevor Project found that 16% of LGBTQ youth in Iowa attempted suicide in 2021, including 22% of transgender and non-binary youth.

105.    A 2021 report from Mental Health America found that Iowa ranked forty-first worst in the nation for the number of youths aged 12-17 suffering from at least one major depressive episode in the past year, which was reported at 41,000 youth or 16.69% of the youth population. Nearly half of these Iowa youth reported that they had received no mental health treatment.

106.    In August 2022, the State reported that "[t]he increase in prevalence of behavioral health problems has coincided with severe disruptions in services, leaving gaps in care for those who need it most . . . From the state's perspective, we are seeing both an increased need for services combined with young kids who need a more acute level of care or crisis stabilization."[7]

107.    As recently as September 2022, in a documentary airing on Iowa PBS addressing teen suicide and access to mental health services for youth in Iowa, Defendant stated that "[w]e're seeing an uptick in all of the precursors for suicidal ideation and . . .  a prevalence in our state — binge drinking rates of depression and access to crisis mental health services. And all of those indicators are having a steep trajectory in our state."

### III.   Defendant Fails to Provide Intensive Home and Community-Based Services to Plaintiff Children.

108.    Defendant's longstanding failure to ensure an adequate mental and behavioral health system is particularly harmful for Medicaid-eligible children with a serious emotional disturbance, such as the Plaintiff children here. Because necessary intensive home and community-based services are not available, Plaintiffs are experiencing or are at risk of deterioration of their mental and behavioral health, resulting in escalating treatment needs, mental and behavioral health

---

[7] Michaela Ramm, *A Cluster of Iowa Youth Suicides Worries Health Officials*, *The Gazette* (August 2022), https://www.thegazette.com/iowa-ideas/the-canary-in-the-coal-mine/.

crises, hospitalizations, unnecessary institutionalization in psychiatric facilities, and an overall decline socially, academically, and in their daily living.

109.    The Centers for Medicare and Medicaid Services (CMS) and Substance Abuse and Mental Health Services Administration (SAMHSA)—two federal agencies that oversee Medicaid and mental health policies—have explained that providing intensive home and community-based services for children with significant mental health needs enables "states [to] comply with their obligations under the Americans with Disabilities Act (ADA) and to Medicaid's Early and Periodic Screening, Diagnostic and Treatment Services (EPSDT) requirements." Joint CMCS and SAMHSA Informational Bulletin, "Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions (May 7, 2013) (CMCS Bulletin), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf.

110.    Providing home and community-based mental and behavioral health services results in "[i]mproved clinical and functional outcomes" for children and "significant improvement in the quality of life for [ ] children, youth, and family," including "[r]educed costs of care," "[i]mproved school attendance and performance," "[i]ncrease in behavioral and emotional strengths," "[m]ore stable living situations," "[r]educed suicide attempts," and "[d]ecreased contacts with law enforcement." *Id.* These services enable "children with complex mental health needs" to "live in community settings and participate fully in family and community life" instead of being treated in "restrictive settings like residential treatment centers, group homes and psychiatric hospitals." *Id.*

111.    For years, the Department of Justice has similarly concluded that "[i]n-home and community-based services effectively support children with mental health conditions and can reduce reliance on segregated residential treatment," thereby, "maintaining [children's] connection

to their families and communities." Dep't of Justice, Findings Letter, Investigation of West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act 22 (June 1, 2015), https://www.justice.gov/sites/default/files/crt/legacy/2015/06/01/wv-ada_findings_6-1-15.pdf.

112.    Most recently, in December 2022, the Department of Justice again found that "[c]ommunity-centered behavioral health programs have had success in preventing institutionalization and producing better outcomes for children and families. With access to timely and appropriate services, even children with intensive behavioral health needs and a history of congregate facility placement are able to return to or remain in family homes where they are more likely to have improved clinical and functional outcomes, better school attendance and performance, and increased behavioral and emotional strengths compared to children receiving care in institutions." Dep't of Justice, Report, Investigation of the State of Alaska's Behavioral Health System for Children 10 (December 15, 2022), https://www.justice.gov/opa/press-release/file/1558151/download.

113.    However, as explained herein, Iowa does not meet its statutory obligations to provide these medically necessary services, specifically: (a) intensive care coordination, (b) intensive in-home therapeutic services, and (c) crises response services.

A.  **Defendant Fails to Provide Necessary Intensive Care Coordination.**

114.    Iowa does not provide Plaintiff children with medically necessary intensive care coordination services. Specifically, Defendant does not provide the services that make up intensive care coordination, including team-based planning, assessment, coordination, outreach, advocacy, and follow-up services as required to meet the Plaintiff children's level of need. While Iowa does provide limited case management services, they are not intensive care coordination.

115.    Intensive care coordination is an essential component of intensive home and community-based services for children with severe or complex mental health diagnoses. *See* CMCS Bulletin. Many Medicaid-eligible children with significant mental health needs receive services from multiple providers or may be involved in multiple systems, such as child welfare, mental health, juvenile justice, and special education. Intensive care coordination is critical to help families successfully navigate and utilize disparate services and treat their children's serious mental and behavioral health needs.

116.    Intensive care coordination is a covered service under Medicaid, which uses the terms "case management" and "targeted case management" to refer to care coordination services. *See* 42 U.S.C. §§ 1396d(a)(19), 1396n(g)(2); 42 C.F.R. §§ 440.169, 441.18. As set forth by CMS and SAMHSA, children with significant mental and behavioral health conditions, such as the Plaintiff children, require intensive care coordination.

117.    Intensive care coordination is a "team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families." CMCS Bulletin. A care coordinator leads the process, and is charged with coordinating a team, that includes the child, family members, providers, and other key members of the child's support network, that together develop, implement, and monitor the child's service plan. Intensive care coordination should include "assessment and service planning"; "accessing and arranging for services"; "coordinating multiple services"; ensuring "access to crisis services"; "advocating for the child and family"; and "monitoring progress." *Id.*

118.    Iowa does not provide services that meet these requirements as part of its Medicaid program. As described in more detail above, the Named Plaintiffs and their families have not received any intensive care coordination. None of the Named Plaintiff children and their families

have received intensive care coordination child and family team meetings to develop and coordinate their care plans, nor have they received any intensive service planning, monitoring, follow-up, or intensive help accessing, arranging, and coordinating services.

119.    Although Medicaid-eligible children in Iowa with a serious emotional disturbance are eligible to receive some care coordination services through providers known as Pediatric Integrated Health Homes (IHH), as well as case management services through their MCOs, these programs are not the same as intensive care coordination and do not provide the same services. Iowa Code § 441—77.47(249A).

120.    In order to qualify for IHH services, children must have health needs that qualify them as having a serious emotional disturbance. Iowa Admin. Code § 441—77.47(1)(249A). Yet, despite this high level of need and Defendant's recognition of these needs, the IHH program does not provide the required services. The limited services the Named Plaintiffs have received under the IHH program generally have consisted of approximately one-hour phone calls one time per month and the occasional in-person visit. On these calls and visits, the IHH workers collect a status update for their records and may provide limited service recommendations, but provide none of the intensive planning, referrals, or follow-up needed for intensive care coordination. The Named Plaintiffs' contact with their assigned MCO case manager has been even less frequent.

121.    According to policy set out in the provider manual, IHH is intended to provide a "[w]raparound planning process" including development of "individualized person-centered care plans addressing the needs of the whole child and family." The IHH team is charged with ensuring "the timely sharing of information across providers"; "monitoring and intervening on progress of member treatment goals"; and "coordinat[ing] multiple systems for children with [a serious

emotional disturbance] as part of a child and family-driven team process." However, in practice, IHH workers provide none of these services.

122.    The excessive caseloads among IHH providers are evidence that what is provided in Iowa is not intensive care coordination, which takes many hours of work per client. Data collected by the University of Iowa shows that IHH providers report caseloads that average 130-200 cases per worker. By contrast, under the intensive, individualized care coordination model needed to adequately support children with high levels of mental and behavioral health needs, care coordination workers should average significantly smaller caseloads.

123.    A 2017 report from the University of Iowa Public Policy Center described the inability of IHHs to do what is required. Specifically, the University of Iowa found that 40% of parents did not receive any assistance from their IHH worker in obtaining family or child counseling or emotional supports, and only 35% of parents reported that their IHH tried to get in touch with them within a week of their child visiting the emergency department.

124.    Parents surveyed by the University of Iowa about their experience with IHH "expressed [an] unmet need for more frequent and personalized services," described that "[t]here are many services that [their] child is not getting," and that they felt "pushed off to the side or forgotten about." Parents also described the lack of staff as a major concern, indicating that "[t]here [are] not enough [IHH] people."

125.    Although Medicaid-eligible children in Iowa are additionally supposed to receive case management through their MCO, these case management services are also not intensive care coordination. Performance data published by DHHS in September 2022 documents that MCO case managers contact families only one time per month on average. This performance data shows that

case managers averaged forty to sixty-two cases, depending on the MCO. This is more than double the caseload that Iowa has indicated would provide intensive, individualized support to families.

126. Without appropriate intensive care coordination services in place, the Named Plaintiffs and their parents have been forced to attempt to cobble together disparate services themselves, often with limited knowledge of what services are available or how to navigate complex requirements to access these services. These parents are simultaneously attempting to manage the difficult and time-consuming day-to-day care for a child with a high level of mental and behavioral health needs, as well as potentially dealing with mental health crises. The result is that children are not provided the services they need.

**B. Defendant Fails to Provide Necessary Intensive In-Home Therapeutic Services.**

127. The Defendant fails to provide intensive in-home therapeutic services necessary to correct or ameliorate children's mental and behavioral health conditions.

128. As set forth by CMS and SAMHSA, "[i]ntensive in-home services are therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placements." CMCS Bulletin. This service is "developed by a team that can offer a combination of therapy from a licensed clinician and skills training and support from a paraprofessional." *Id.* The service package should then include both "individual and family therapy," as well as "behavioral interventions" and "skills training." *Id.* Staff providing intensive in-home therapeutic services should "have small caseloads to allow them to work with the child and family intensively." *Id.* Intensive in-home therapeutic services are coverable under Medicaid as a rehabilitative service. *See* 42 U.S.C. § 1396d(a)(13), 42 C.F.R. § 440.130(d). They are medically necessary for children with severe or complex mental health conditions.

129.    Iowa does not provide the required services. None of the Named Plaintiffs have received therapy from a licensed clinician in their home. While Iowa does have a program for in-home services for children, called Behavioral Health and Intervention Services (BHIS), BHIS does not provide the required services. Iowa Code § 441—78.12(249A). Children receiving BHIS by definition have significant mental health needs that impact their functioning: by policy they must be diagnosed with "a psychological disorder that interferes with [their] functioning in family, school, or community activities." Yet BHIS is only designed to provide limited behavioral interventions and skills training by a para-professional–a very limited component of what actually constitutes intensive in-home therapeutic services.

130.    Even these more limited services are often unavailable or are not delivered promptly. Individual Named Plaintiffs have waited weeks, months, or even years to receive the limited behavior interventions and skills training that BHIS is supposed to provide–even after these services had been specifically recommended by the children's treating healthcare professionals.

131.    In addition, the behavioral interventions and skills training that are provided under BHIS are not the same as intensive in-home therapeutic services and are not provided with the frequency and intensity needed to meet the significant mental health needs of the Plaintiff population. CMH and SAMHSA require that "staff providing intensive in-home services [should] have small caseloads to allow them to work with the child and family intensively." CMCS Bulletin. In contrast, BHIS workers typically carry high caseloads making the necessary individualized attention impossible. Where the Named Plaintiffs have received services under BHIS, they did not receive the types of services, or services at the frequency or intensity, required to meet their needs.

### C. **Defendant Fails to Provide Necessary Crisis Response Services.**

132.    Defendant fails to provide adequate services to address mental and behavioral health crises that Plaintiff children experience at home and in the community.

133.    CMS and SAMHSA have indicated that, "[m]obile crisis response and stabilization services are instrumental in defusing and de-escalating difficult mental health situations and preventing unnecessary out-of-home placements." CMCS Bulletin. In its August 2022 guidance to states regarding the delivery of behavioral health services for children and youth, CMS recommends that to "increase access to treatment along the continuum of care," states should consider "[i]mplement[ing] or expand[ing] access to crisis stabilization services and utiliz[ing] Medicaid administrative claiming for implementation of crisis lines." Crisis response services are covered under Medicaid as rehabilitative services. *See* 42 U.S.C. § 1396d(a)(13); 42 C.F.R. § 440.130(d).

134.    Mobile crisis services should be "available 24/7" and "provided in the home or any setting where a crisis may be occurring," including the child's home, school, or in the community. CMCS Bulletin. "In addition to assisting the child and family to resolve the immediate crisis, the team works with them to identify potential triggers of future crises, and learn strategies for effectively dealing with potential future crises that may arise," and connect them with needed services. *Id.* "[M]obile crisis services are effective at diverting people in crisis from psychiatric hospitalization," effective at "linking people in crisis to outpatient services," and are more cost effective than relying on typical police intervention. *Id.* Since 2015, advocates from Iowa's Coalition for a Children's Mental Health Redesign have called for the need to "[i]mplement mobile crisis units across Iowa."

135.    Crises stabilization services are designed to prevent or ameliorate a behavioral health crisis and/or reduce acute symptoms of mental illness by providing continuous 24-hour

observation and supervision. Crises stabilization is an acute, short-term intervention that can help to deescalate a crisis without the use of long-term inpatient services.

136.    However, mobile crisis response services and crises stabilization are not consistently available to Plaintiff children. As of 2019, Iowa law requires the provision of "community-based crisis services" for children, including a continuum of crisis services. Iowa Code § 331.397A(4).[8] However, as of July 1, 2022, DHHS regional data shows that only about half of all regions in Iowa have any sort of mobile crisis services able to deliver timely crisis services. Only two regions have crisis stabilization community-based services for those under eighteen years of age.

137.    In addition, in several areas of the State, mobile crisis services are accessible only through organizations such as the police, schools or hospitals, in violation of the basic requirements that mobile crises services be available in the home, along with other community settings, and provided 24/7–whenever a crisis might occur.

138.    None of the Named Plaintiffs and their parents have received necessary mobile crises services or other crises stabilizations services sufficient to address their crisis needs in their homes, schools, or other community settings. When faced with a mental health crisis, the Named Plaintiffs were forced to either call the police or to visit the emergency room, and have cycled repeatedly through in-patient placements.

---

[8] Iowa law also requires the provision of Crisis Stabilization Residential Services (CSRS). Iowa Code § 331.397A(4). CSRS must be provided in facility-based settings of no more than 16 beds and lengths of stay are expected to be no longer than five (5) days, though they can be extended.

**D. Plaintiffs Risk Segregation, Lack of Integration in the Community, and Unnecessary and Harmful Institutionalization.**

139.     When the Plaintiff children do not receive services necessary to treat their mental and behavioral health conditions, they face deterioration of their mental and behavioral health and a decline in a variety of aspects of their life. Children who fail to receive adequate treatment for mental and behavioral health conditions are at substantially greater risk than other children of engaging in self-harm, dropping out of school, developing substance related disorders, and involvement with the juvenile justice system. Research has demonstrated that poor outcomes for these children as youth correlate with poor outcomes later in their adulthood.

140.     Defendant's failure to provide or arrange for the necessary intensive home and community-based services also cause children to not be integrated into their communities and to be unnecessarily placed in psychiatric institutions and other restrictive facilities, rather than receiving appropriate treatment while remaining in their homes and with their families.

141.     In Iowa, children in crisis or children who are determined to need a higher level of mental health care may be placed in short-term in-patient settings such as hospitals, or may be placed in long-term facilities such as Psychiatric Medical Institutions for Children (PMICs) or Mental Health Institutes (MHIs). PMICs are private institutions "providing more than twenty-four hours of continuous care" for children, with "expected periods of ninety days or more for treatment." Iowa Code § 135H.1. Mental Health Institutes are state hospitals for persons with mental illness. Iowa Code § 226.

142.     The latest data available, provided as part of a public records request, reflects that in fiscal year 2017 hundreds of children were admitted to a PMIC facility, at times reaching over 300 children in any given quarter, with the average length of stay at such in-state facilities lasting

upwards of 3-4 months. Hundreds more children were admitted to the emergency room each fiscal quarter for treatment of their behavioral health needs.

143.    Moreover, Iowa has also failed to make available the data needed to reveal the magnitude of dangerous service gaps for Medicaid-eligible children with a serious emotional disturbance, such as the Plaintiff children. In its Olmstead Plan Framework 2016-2020, DHHS identified "data sources" as an outcome needed to "provide[] a framework for community living," including in particular data on children served in institutional settings. And yet, upon information and belief, none of the data that should be captured according to the Plan is publicly available.

144.    Even for Plaintiff children who are not institutionalized, the State's failure to provide or arrange for medically necessary home and community-based services risks segregation, or actually segregates them, from their communities and also risks causing, or actually causes, a lack of participation or integration in community activities to the fullest extent possible, including school, work, community, extra-curricular activities, hobbies, and other everyday life activities.

145.    Although "relinquishment of a child's custody shall not be a condition of the child receiving [institutional mental health] services" under Iowa law, on information and belief, parents have been forced to have their child adjudicated a Child in Need of Assistance (CINA), placing their child into the custody of the State, in a desperate last attempt to get their child necessary mental health services. *See* Iowa Code § 135H.6(1)(g). This has been necessary because services are not available in the community.

146.    The Named Plaintiff children each have experienced, or are at risk of experiencing, a lack of integration with, and segregation from, the community, and either have been institutionalized, or are at risk of institutionalization, because the required intensive home and

community-based services are not available to them and because of the methods Defendant uses to administer Iowa's mental and behavioral health Medicaid services.

**E.  Defendant Administers the Medicaid Program Using Discriminatory Methods, Including Failure to Monitor, Identify the Need for Corrective Action, and Take Remedial Measures.**

147.   Despite knowing for years about the problems within the children's mental and behavioral health system, Defendant continues to fail to take accountability for ensuring adequate mental health services for Medicaid eligible children with a serious emotional disturbance. Defendant has failed to develop policies, practices, and procedures to effectively accommodate Medicaid-eligible children with a serious emotional disturbance, including failing to provide information regarding alternative, community-based services and intensive home and community-based services that would avoid hospitalization or placement in an institution; failing to evaluate the long-term care needs of these children; failing to assess whether the needs of these children could be met in a community-based setting; and by failing to prepare and implement discharge planning.

148.   In November 2020, DHHS (at the time DHS) admitted that it makes little to no effort to track the State's progress with developing a children's mental and behavioral health system or to gauge whether children on Medicaid are receiving the mental and behavioral health services they need. For example, DHHS reported, in response to a public records request that it "does not currently prepare or receive reports that indicate whether Medicaid-eligible children are receiving the Behavioral Health care that screening has indicated they need and/or that they have been referred for based on their need and/or the timeliness of such services." It also stated that it "does not currently prepare or receive reports that track Medicaid-eligible children who have

applied for, but have not received, services covered by the CMH Waiver, or whether such children are receiving Behavioral Health services in the least-restrictive setting."

149.    DHHS admitted that it fails to monitor the performance of the very organizations tasked with administering Medicaid to Iowans. For example, DHHS stated that it "does not currently prepare or receive reports reflecting any non-compliance of any Managed Care Organization or Service Provider to meet contractual obligations or performance requirements specific to the delivery of Behavioral Health care to Medicaid-eligible children." DHHS also "does not currently prepare or receive reports reflecting complaints, grievances, or consumer contacts to either the Department, Managed Care Organizations, or Services Providers specific to the availability of Behavioral Health services for Medicaid-eligible children or delays in accessing Behavioral Health services, including complaints, grievances, or any consumer contacts regarding the availability of community-based Behavioral Health services, or reports regarding any consideration analysis, review, or response with regard to such complaints, grievances, or any consumer contacts."

150.    This failure to monitor or enforce the performance of the MCOs was confirmed in an October 2021 report released by the Iowa Auditor of State. The MCO contracts require the MCOs to ensure EPSDT services are provided and that outreach, monitoring, and evaluation strategies are implemented for EPSDT services. *See* MCO Contracts, Section 3.2.7.3. However, the Auditor's report found that, for at least one MCO, that "[MCO] has made no monitoring efforts, which is a violation of the [MCO's State] contract. In addition, it appears the State has never set required reporting deadlines, and [the MCO] has never reported, which is also a violation of the contract."

151.    Despite years of reports highlighting widespread shortages of children's mental health providers and the resulting barrier to care, DHHS also admitted, in response to a public records request that it "does not currently prepare or receive reports that indicate workforce shortages for service providers for Medicaid-eligible children and/or incentives for curing such shortages."

## CLASS ALLEGATIONS

152.    The Named Plaintiffs properly maintain this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

153.    As noted above, the Class is defined as all Medicaid-eligible children in the State of Iowa under the age of twenty-one who (a) have a serious emotional disturbance, not attributable to an intellectual or developmental disability, and (b) for whom a licensed practitioner of the healing arts has recommended intensive home and community-based services to correct or ameliorate their conditions.

154.    The Class is sufficiently numerous to make joinder impracticable. Medicaid covers three out of eight children in Iowa, roughly 300,000 individuals, including all children involved in the foster care system.[9] There were 87,052 Iowan children aged zero to twenty with a serious emotional disturbance served by the "state mental health authority" in state fiscal year 2020, 94% of whom received services covered by Medicaid.[10] Most conservatively, the Class is composed of at least approximately 13,000 children who have been enrolled in Pediatric Integrated Health

---

[9] Kaiser Family Found., Medicaid in Iowa (Oct. 2022), https://files.kff.org/attachment/fact-sheet-medicaid-state-IA; Kaiser Family Found., Medicaid Enrollees by Enrollment Group (2019), https://www.kff.org/medicaid/state-indicator/distribution-of-medicaid-enrollees-by-enrollment-group/.
[10] Iowa 2020 Mental Health National Outcome Measures (NOMS): SAMHSA Uniform Reporting System, at 7, 11, https://www.samhsa.gov/data/sites/default/files/reports/rpt35304/Iowa.pdf.

Homes, and thereby meet the Class definition,[11] and likely includes substantial numbers of additional children. Further, the fluid nature of the Class, the geographically diverse Class members, the limited financial resources of Class members, as well as the unknown identity of future Class members make joinder impracticable.

155.    The deficiencies in mental and behavioral health care described above, and the resulting harms to the children in the Class, arise from Defendant's statewide policies and practices, including the following:

a.    Defendant's failure to maintain a sufficient array of intensive home and community-based mental and behavioral health services, including intensive care coordination, intensive in-home services, and crisis response services, to meet the needs of children in the Class.

b.    Defendant's failure to implement or ensure adequate policies and practices to reasonably ensure a sufficient array of intensive home and community-based mental and behavioral healthcare providers, including providers of intensive care coordination, intensive in-home services, and crisis response services, to meet the needs of the children in the Class.

c.    Defendant's failure to implement adequate policies and practices to reasonably ensure that children in the Class are able to obtain the intensive home and community-based services to which they are entitled and to receive such services with reasonable promptness. This includes a failure to implement processes for monitoring the

---

[11] Based on Pediatric Integrated Health Home Enrollment for the years 2017 to 2019 (produced in response to public records request).

extent to which Class members are able to obtain such services and identifying the need for corrective action.

d.       Defendant's failure to implement adequate policies and practices to reasonably ensure that the children in the Class are able to obtain medically necessary mental and behavioral health services in the least restrictive environment and most integrated setting appropriate to their needs, and are not unnecessarily segregated, institutionalized, or placed at risk of institutionalization because intensive home and community-based services are unavailable. This includes failure to implement adequate processes for monitoring the extent to which children in the Class are unnecessarily segregated, institutionalized, or placed at risk of institutionalization and lack of community integration, and identifying the need for corrective action.

156.    These policies and practices arise from action and inaction taken by the Defendant. The policies and practices, and their consequences, have been so widespread and consistent that the Defendant has acquiesced to them.

157.    As a result of the policies and practices described above, children in the Class  are subject to serious harm and risk of future harm including the following: (a) they are being denied the intensive home and community-based services to which they are entitled under the Medicaid Act; (b) they are being denied intensive home and community-based services with reasonable promptness as required by the Medicaid Act; (c) they are unable to obtain mental and behavioral health services in the least restrictive environment and the most integrated setting appropriate to their needs; (d) they are unnecessarily segregated; (e) they are unnecessarily institutionalized and placed at risk of institutionalization and lack of community integration; and (f) they are exposed

to significant risk of imminent future violations of the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act.

158.    There are questions of fact and law common to the claims of all Class members, including the following:

      a.    Whether Defendant's failure to provide or ensure that medically necessary intensive home and community-based services are available, and the resulting risk that Class members will be unable to obtain such services, or to obtain such services with reasonable promptness, violates the Medicaid Act.

      b.    Whether Defendant's failure to implement adequate policies and practices to reasonably monitor and ensure that Class members are able to obtain intensive home and community-based services and the resulting risk that Class members will be unable to obtain those services, or to obtain them with reasonable promptness, violates the Medicaid Act.

      c.    Whether Defendant's failure to ensure that sufficient qualified providers of intensive home and community-based services are available to meet the needs of the Class, and the resulting risk that Class members will be unable to obtain those services, or to obtain them with reasonable promptness, violates the Medicaid Act.

      d.    Whether Defendant's failure to make available intensive home and community-based services to members of the Class in the most integrated setting appropriate to their needs, thereby segregating members of the Class or placing them at risk of institutionalization and lack of community integration, violates the ADA and the Rehabilitation Act.

e.      Whether Defendant's failure to implement adequate coordination, policies and practices, and to reasonably monitor and ensure that Class members are able to obtain intensive home and community-based services in the most integrated setting appropriate to their needs, violates the ADA and the Rehabilitation Act.

f.      Whether Defendant's failure to provide a sufficient array of intensive home and community-based providers and to implement adequate policies and practices to reasonably ensure a sufficient array of these services, such that members of the Class are able to obtain mental and behavioral health services in the most integrated setting appropriate to their needs and are not segregated or placed at risk of institutionalization and lack of community integration, violates the ADA and the Rehabilitation Act.

g.      Whether Defendant's methods of administering their mental and behavioral health system violate the Named Plaintiffs and Class members' rights under Title II of the ADA, the Rehabilitation Act, and their implementing regulations.

h.      Whether the Named Plaintiffs and Class members are entitled to declaratory and injunctive relief to vindicate their statutory rights.

159.    The Named Plaintiffs are each members of the Class. The claims that the Named Plaintiffs raise, and the resulting harms and risks of serious harm, are typical of those of the Class. Class member's claims arise from the same course of events and circumstances, and each Class member would make similar legal arguments to prove Defendant's liability. The remedies sought by the Named Plaintiffs are the same remedies that would benefit the Class: a declaration that their statutory rights have been violated and an injunction requiring the Defendant to take affirmative action to cure the ongoing violations of law and to provide or arrange for sufficient intensive home

and community-based services to correct or ameliorate the mental health conditions of the Named Plaintiffs and members of the Class.

160.    The Named Plaintiffs will fairly and adequately represent the interests of the Class. There are no conflicts among the Named Plaintiffs and any members of the Class. The Next Friends, who are the mothers of the Named Plaintiffs, are dedicated to representing the best interests of the Named Plaintiffs.

161.    The undersigned counsel have extensive experience in litigating civil rights and class action lawsuits, including those involving the rights of children, and the rights of individuals with mental and behavioral health conditions and disabilities.

162.    Defendant has acted or refused to act on grounds that are generally applicable to the Class, and injunctive and declaratory relief are appropriate respecting the Class as a whole.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### (Violations of the EPSDT Provisions of the Medicaid Act)

163.    The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

164.    Defendant, while acting under color of state law, has violated the EPSDT provisions of the Medicaid Act, by failing to provide or arrange for the Named Plaintiffs and children in the Class to receive intensive home and community-based services that are medically necessary to correct or ameliorate their mental health conditions. 42 U.S.C. Section §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(r).

165.    Defendant's acts and omissions described above violate 42 U.S.C. § 1983 by depriving the Named Plaintiffs and the members of the Class of their statutory rights.

## SECOND CAUSE OF ACTION

### (Violations of Reasonable Promptness Provision of the Medicaid Act)

166.    The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

167.    Defendant, while acting under color of state law, has violated the Reasonable Promptness provision of the Medicaid Act, by failing to provide or arrange for the Named Plaintiffs and children in the Class, to receive intensive home and community-based services with "reasonable promptness," in violation of 42 U.S.C. § 1396a(a)(8).

168.    Defendant's acts and omissions described above violate 42 U.S.C. § 1983 by depriving the Named Plaintiffs and the members of the Class of their statutory rights.

## THIRD CAUSE OF ACTION

### (Violations of the ADA)

169.    The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

170.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

171.    Title II of the ADA also requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

172.    The Named Plaintiffs and members of the Class have mental impairments that substantially limit one or more major life activities, or have a record of such impairments, and

48

therefore have a disability as defined by the ADA, 42 U.S.C. §§ 12102 *et seq.*, and its implementing regulations, 28 C.F.R. § 35.108.

173.   The Named Plaintiffs and members of the Class are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104.

174.   The Named Plaintiffs and members of the Class are qualified to receive services in the most integrated community-based settings that meet their mental and behavioral health needs and they wish to receive such services in the community.

175.   Defendant, named in her official capacity, is a public entity as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

176.   Defendant fails to provide intensive home and community-based services and fails to adequately implement and administer the mental health service system. Defendant discriminates against the Named Plaintiffs and the Class by denying them the opportunity to receive necessary services in integrated settings, thus causing them to be unnecessarily segregated or placed at risk of institutionalization and lack of community integration in violation of Title II of the ADA. 28 C.F.R. § 35.130(d).

177.   Defendant fails to make reasonable modifications to her policies, practices, and procedures that are necessary to avoid discrimination against the Named Plaintiffs and the Class on the basis of their disabilities. 28 C.F.R. § 35.130(b)(7).

178.   Serving the Named Plaintiffs and the members of the Class in the most integrated settings appropriate to their needs and making reasonable modifications would not fundamentally alter the nature of the Defendant's services, programs, or activities. 28 C.F.R. § 35.130(b)(7).

179.     Defendant fails to administer services, programs, and activities for the Named Plaintiffs and members of the Class in the most integrated setting appropriate to their needs. 28 C.F.R. §§ 35.130(d), 35.152(b)(2).

180.     Defendants are prohibited under Title II of the ADA and its implementing regulations from discriminating against individuals with disabilities. 42 U.S.C. §§ 12131, 12132; 28 C.F.R. § 35.130.

181.     Pursuant to the regulations implementing Title II of the ADA, Defendants are prohibited from utilizing criteria or other methods of administration: "(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

182.     Defendants utilize methods of administration that have the effect of subjecting Plaintiffs to discrimination and cause Plaintiffs to live unnecessarily in segregated institutions, or be at risk of institutionalization and lack of community integration, instead of living in the most integrated setting appropriate to their needs.

183.     Plaintiffs have suffered irreparable injury because of Defendants' failure to utilize methods of administration that facilitate the receipt of services and placement in the most integrated settings appropriate to their needs. Plaintiffs are without adequate remedy at law.

184.     Defendant violates the rights of the Named Plaintiffs and members of the Class under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations.

## FOURTH CAUSE OF ACTION

### (Violations of Section 504 of the Rehabilitation Act)

185.    The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

186.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

187.    The Named Plaintiffs and members of the Class have mental impairments that substantially limit one or more major life activities, or have a record of such impairments, and therefore have a disability for purposes of the RA and its implementing regulations, 45 C.F.R. § 84.3(j).

188.    The Named Plaintiffs and members of the Class are "qualified individuals with disabilities" for purposes of the Rehabilitation Act and its implementing regulations, 45 C.F.R. §§ 84.3(j), 84.3(l)(4).

189.    The Named Plaintiffs and members of the Class are qualified to receive services in the most integrated community-based settings that meet their mental and behavioral health needs and they wish to receive such services in the community.

190.    Defendant operate programs or activities that receives federal financial assistance for purposes of 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. § 84.3(k).

191.    By failing to provide intensive home and community-based mental health services and failing to adequately implement and administer the State's mental health service system, Defendant discriminates against the Named Plaintiffs and Class members by denying them the opportunity to receive the services they need in integrated settings, thus causing them to be

unnecessarily segregated or placed at risk of institutionalization and lack of community integration in violation of the Rehabilitation Act.

192.     Defendants are further prohibited under the Rehabilitation Act and its implementing regulations from discriminating against individuals with disabilities. 29 U.S.C. § 794; 45 C.F.R. § 84.4(b).

193.     Pursuant to the regulations implementing the Rehabilitation Act, Defendants are prohibited from utilizing criteria or other methods of administration "(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped." 45 C.F.R. § 84.4(b).

194.     Defendants utilize methods of administration that have the effect of subjecting Plaintiffs to discrimination and cause Plaintiffs to live unnecessarily in segregated institutions, or be at risk of institutionalization and lack of community integration, instead of living in the most integrated setting appropriate to their needs.

195.     Plaintiffs have suffered irreparable injury because of Defendants' failure to utilize methods of administration that facilitate the receipt of services and placement in the most integrated settings appropriate to their needs. Plaintiffs are without adequate remedy at law.

196.     Defendant violates the rights of Plaintiffs and members of the Class under Section 504, 29 U.S.C. § 794, and its implementing regulations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.       Assert subject matter jurisdiction over this action;

b.      Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c.      Declare unlawful, pursuant to Rule 57 of the Federal Rules of Civil Procedure, Defendant's conduct as alleged herein as a violation of the Plaintiffs' rights under: (i) the EPSDT and Reasonable Promptness Provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), 1396d(r), 1396a(a)(8); (ii) Title II of the ADA, 42 U.S.C. §§ 12101 *et seq.*; and (iii) Section 504, 29 U.S.C. § 794;

d.      Grant permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, requiring Defendant to: (a) establish and implement policies and practices to ensure the timely provision of intensive home and community-based mental and behavioral health services—specifically Intensive Care Coordination, Intensive In-Home Therapeutic Services and Crisis Response Services—to the Named Plaintiffs and Class members; (b) promptly arrange for the intensive home and community-based services for which the Named Plaintiffs and Class members are eligible; (c) establish and implement policies and practices to ensure Defendant does not discriminate against the Named Plaintiffs and Class Members and instead provide them Medicaid services in the most integrated setting appropriate to their needs; and (d) establish and implement policies and practices that allow the Named Plaintiffs and Class members to live and receive services in the most integrated setting appropriate to meet their needs under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, and their implementing regulations, including 28 C.F.R. § 35.130(b)(3) and 45 C.F.R. § 84.4(b).

e.       Retain jurisdiction over the Defendant until such time as the Court is satisfied that the Defendant has implemented and sustained this injunctive relief;

f.      Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C.

§ 12205, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.      Grant such further relief as the Court may deem just, necessary, and proper.


Dated: January 6, 2023


Respectfully Submitted,


**CHILDREN'S RIGHTS**

/s/ *Harry Frischer*                     .
Harry Frischer (*Pro hac vice* forthcoming)
Madeleine M. Kinney (*Pro hac vice* forthcoming)
Stephanie Persson (*Pro hac vice* forthcoming)
Shira Wisotsky (*Pro hac vice* forthcoming)
88 Pine Street, Suite 800
New York, NY 10005
(212) 683-2210
hfrischer@childrensrights.org
mkinney@childrensrights.org
spersson@childrensrights.org
swisotsky@childrensrights.org

**DISABILITY RIGHTS IOWA**

/s/ *Cynthia A. Miller*                     .
Cynthia A. Miller
Catherine Johnson
Nathan Kirstein
666 Walnut Street, Suite 1440
Des Moines, IA 50309
(515) 278-2502
cmiller@driowa.org
cjohnson@driowa.org
nkirstein@driowa.org


**NATIONAL HEALTH LAW PROGRAM**

/s/ *Kimberly Lewis*                     .
Kimberly Lewis (*Pro hac vice* forthcoming)
Elizabeth Edwards (*Pro hac vice* forthcoming)
3701 Wilshire Blvd., Suite 750
Los Angeles, CA 90010
(310) 204-6010
lewis@healthlaw.org
edwards@healthlaw.org

**ROPES & GRAY LLP**

/s/ *Timothy R. Farrell*                     .
Timothy R. Farrell (*Pro hac vice* forthcoming)
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
(312) 845-1209
timothy.farrell@ropesgray.com


*ATTORNEYS FOR PLAINTIFFS*