IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| C.A. through their next friend P.A., C.B. through his next friend P.B., and C.C. through his next friend P.C., for themselves and those similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>KELLY GARCIA, in her official capacity as Director of the Department of Health and Human Services,<br><br>    Defendant. | No.  4:23-cv-00009-SHL-HCA<br><br><br>**ORDER DENYING DEFENDANT'S PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

    Plaintiffs—three Medicaid-eligible children—bring putative class action claims alleging that the Iowa Department of Health and Human Services ("DHHS") has failed to provide them with adequate mental and behavioral health treatment. Plaintiffs seek an injunction requiring DHHS to take steps to ensure Plaintiffs and putative class members are provided with these services. DHHS moves to dismiss some of Plaintiffs' claims for failure to state a claim and on statute of limitations grounds. The Court concludes the Complaint plausibly alleges violations of the Medicaid Act and is not time-barred because Plaintiffs are only seeking prospective injunctive relief. The Court therefore DENIES the Partial Motion to Dismiss.

**I.    Background[1]**

    Plaintiffs have been diagnosed with a variety of mental and behavioral health conditions. (ECF 1, ¶¶ 15, 17, 31, 33, 45, 47.) These conditions substantially limit their functioning in family, school, and community activities and significantly impact their ability to learn, communicate, and care for themselves. (Id., ¶¶ 10, 18, 34, 48.) Plaintiffs' medical providers recommended they receive intensive home and community-based services to correct or treat their conditions. (Id., ¶ 10.) Plaintiffs allege, however, that Iowa's Medicaid program does not adequately provide these services—specifically intensive care coordination, intensive in-home therapeutic services, and

---

[1] On a motion to dismiss, the Court accepts as true all well-pled facts and draws all reasonable inferences in the light most favorable to Plaintiffs. *Glick v. W. Power Sports, Inc*., 944 F.3d 714, 717 (8th Cir. 2019). The recitation of facts in the Background section should not be construed as findings of fact.

1

crisis response services. (Id., ¶ 5.) As a result, Plaintiffs have been (or currently are) separated from their families and community and institutionalized at mental health facilities. (Id., ¶¶ 14, 27–28, 37, 40–42, 53, 55, 57.) Plaintiffs allege this is a systemic problem and seek to represent a class "of at least approximately 13,000 children." (Id., ¶¶ 154–56.)

### A. DHHS and Implementation of Medicaid in Iowa.

Medicaid is a joint federal and state program that provides federal funding to help states furnish medical assistance to low-income individuals and families. 42 U.S.C. § 1396-1. The services provided to Medicaid-eligible people under the age of 21 include Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B). EPSDT services include "screening services . . . to determine the existence of certain physical or mental illnesses or conditions" and "such other necessary health care, diagnostic services, treatment, and other measures described in [42 U.S.C. § 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r).

To participate in Medicaid and receive federal funding, a State must maintain an approved plan for medical assistance. 42 U.S.C. §§ 1396a, 1396b. The plan must adhere to Medicaid Act requirements and implementing regulations and appoint a single state agency to be responsible for administering or supervising the administration of the plan. 42 U.S.C. § 1396a(a). DHHS is the agency responsible for oversight of Iowa's Medicaid program, see Iowa Code §§ 217.1, 249A.4, including oversight of Managed Care Organizations (MCOs) that deliver health services to Medicaid-eligible individuals pursuant to contracts with the State, see Iowa Code § 249A.4.

### B. Criticism of Mental Health Treatment for Medicaid-Eligible Children in Iowa.

Plaintiffs allege that there have been calls by various organizations to improve mental health treatment and access for children in Iowa dating back to at least 2015. (ECF 1, ¶¶ 88–91.) In consumer surveys taken in 2017, 75% of parents of Medicaid-eligible children described difficulties accessing providers who accepted Medicaid. (Id., ¶ 92.) In 2018, the Iowa Legislature's Children's Mental Health and Well-Being Committee noted many gaps in the provision of mental health treatment, stating: "There is no children's mental health and wellbeing system in Iowa. Instead, children with mental health and other challenges have been served by cobbling together disconnected services, resources and knowledge." (Id., ¶¶ 93–95.) In 2019, the

2

Iowa Legislature's Health and Human Services Appropriations Subcommittee said in a presentation that Iowa's healthcare systems were "inadequate to address Iowa's children's mental health needs." (Id., ¶ 96.)

Also in 2019, the Iowa Mental Health and Disability Services ("MHDS") Commission[2] raised concerns with how MCOs were providing mental and behavioral health services, including that providers were understaffed and having difficulty with reimbursement, among other procedural and financial barriers to the provision of care. (Id., ¶ 17.) In 2020 and 2021, the Children's Behavioral Health System State Board[3] similarly described the need for a "comprehensive, statewide behavioral health system" and identified barriers to improving Iowa's children's mental health system including "Medicaid reimbursement rates for psychiatric services and behavioral health providers" and "low wages as a result of low Medicaid reimbursement rates." (Id., ¶¶ 98–99.) The Board made similar findings again in late 2021 and early 2022. (Id., ¶¶ 100–01.) In August 2022, the Iowa Department of Public Health acknowledged an "increase in prevalence of behavioral health problems has coincided with severe disruptions in services, leaving gaps in care for those who need it most . . . ." (Id., ¶ 106.)

  C. *The History of Plaintiffs' Mental and Behavioral Health and Treatment.*

C.A.'s treating providers have recommended that C.A. receive individual therapy, skills training, mobile crisis services, and intensive care coordination. (Id., ¶ 22.) It is, however, unclear when those recommendations were made or to whom. (Id.) C.A. began experiencing suicidal ideation in the fall of 2021, and in March 2022 C.A. was hospitalized after attempting suicide and spent four days at a pediatric inpatient facility. (Id., ¶ 19.) Between March and June 2022, C.A. attempted suicide five more times and was treated in the emergency room and/or placed in a residential facility. (Id., ¶ 21.) Upon discharge, C.A. received only limited medication

---

[2] The MHDS Commission is "the state policy-making body for the provision of services to persons with mental illness, intellectual disabilities or other developmental disabilities, or brain injury. It is authorized by Section 225C.5 of the Code of Iowa." *Iowa's Mental Health and Disability Services (MHDS) Commission*, State of Iowa Department of Health and Human Services, https://hhs.iowa.gov/about/mhds-advisory-groups/commission (last visited May 1, 2023).

[3] "The Children's Behavioral Health System State Board (Children's Board) is the single point of responsibility in the implementation and management of a Children's Mental Health System (Children's System) that is committed to improving children's well-being, building healthy and resilient children, providing for educational growth, and coordinating medical and mental health care for those in need." *Children's Behavioral Health System State Board*, State of Iowa Department of Health and Human Services, https://hhs.iowa.gov/about/mhds-advisory-groups/childrens-system-state-board (last visited May 1, 2023).

management and out-patient counseling and no discharge planning to receive intensive home and community-based services. (Id., ¶¶ 20–21.)

When attempting to access mobile crises services or crises hotlines, C.A. was told only to go to the emergency room, which did not have pediatric mental health specialists. (Id., ¶ 23.) C.A. never received in-home therapy or intensive care coordination. (Id., ¶¶ 24–25.) C.A.'s mother unilaterally applied for Iowa's limited care coordination program in May 2022, but because there were no intensive care coordination services available, the services C.A. received did not include family and team planning, intensive assessment or coordination services, or transition planning. (Id., ¶ 25.) C.A. also sought home and community-based skills training in late May but did not receive these services before needing to be placed in a restrictive residential placement facility. (Id., ¶¶ 24, 26, 28.)

C.B.'s treating providers, on the other hand, have recommended a variety of intensive home and community-based services dating back to 2015, including recommendations for coping-skills-building and family-skills training, cognitive behavioral therapy, interventions targeting attachment and family functioning, and in-home services for adaptive functioning skills, and trauma therapy. (Id., ¶ 36(i).) C.B. finally began receiving "limited skills training in April 2020," which was "over four years after the initial recommendation." (Id., ¶ 36(ii).) C.B.'s skills training stopped in August 2022, and C.B. was on a waitlist for over three months before the training was reestablished. (Id., ¶ 36(iii).) C.B. also began receiving some care coordination in 2022, but it was limited to monthly calls and brief quarterly visits. (Id., ¶ 36(iv).) C.B. "received no assistance with access to services or intensive care coordination across providers." (Id.)

C.B. has been institutionalized at various times for aggressive behavior, including for a five-month period beginning in August 2021. (Id., ¶ 37.) When he returned home, C.B. received only "limited skills training and care coordination," rather than the intensive home and community-based mental health services his treatment providers recommended both before and after discharge. (Id., ¶ 38.) The recommended services included medication management, skills training, individual and family therapy, and care coordination services. (Id.) C.B.'s mother has, without success, "repeatedly sought to secure intensive home and community-based services" for C.B., although the limited services C.B. did receive improved his behavior. (Id., ¶¶ 39–40.)

Finally, C.C.'s treating providers have recommended a variety of intensive home and community-based services dating back to 2015, including individual, family, and group therapy;

medication management; and home and school positive behavior management. (Id., ¶ 50.) C.C.'s mother "has repeatedly sought to secure intensive home and community-based services" without success. (Id., ¶¶ 56–57.) C.C. has, for example, never received any intensive in-home therapeutic services. (Id., ¶ 51.) C.C. has exhibited self-harm, impulsivity, extreme anxiety, and various inappropriate behaviors. (Id., ¶¶ 49, 53.) Beginning in September 2020, C.C. was institutionalized for five-and- one-half months. (Id., ¶ 53.) Upon discharge, C.C. still could not access the services recommended by treatment providers, instead receiving only limited skills training—and those services have not been provided since the summer of 2022. (Id., ¶¶ 51, 54.) The care coordination C.C. received did not include family team planning processes or intensive service planning, monitoring, or follow-up. (Id., ¶ 52.)

      D.  *The Complaint and DHHS's Partial Motion to Dismiss.*

Plaintiffs filed suit on January 6, 2023. (ECF 1.) Their Complaint alleges four Counts: violations of Medicaid Act provisions relating to EPSDT services (Count I); violations of the Medicaid Act's "reasonable promptness" provision (Count II); violations of Title II of the Americans with Disabilities Act (the "ADA") (Count III); and violations of Section 504 of the Rehabilitation Act (Count IV). (ECF 1, ¶¶ 163–96.) Plaintiffs do not seek money damages. (Id., pp. 55–57.) Rather, they ask for injunctive relief requiring DHHS to take steps to provide Plaintiffs and class members with adequate mental health treatment and services. (Id.)

DHHS moves to dismiss Plaintiffs' Medicaid Act claims (Counts I and II) for failure to state a claim. (ECF 22.) DHHS argues, *inter alia*, that it is not required to ensure Plaintiffs have access to treatment and the Complaint otherwise fails to connect Plaintiffs' injuries with DHHS conduct. (Id., pp. 8–16.) DHHS also moves to dismiss "any of Plaintiffs' claims which are dependent on events occurring prior to January 6, 2021" as being barred by Iowa's two-year statute of limitations on personal injury claims. (Id., pp. 16–17.) Plaintiffs' ADA and Rehabilitation Act claims (Counts III and IV) are not at issue in DHHS's Motion.

**II.**    **Legal Analysis**

      A.  *Motion to Dismiss Standard.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a

'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

> B. Plaintiffs Have Stated a Plausible Claim in Count One that DHHS Violated the Medicaid Act's EPSDT Provisions.

Count One of the Complaint alleges, *inter alia*, violations of two EPSDT-related provisions of the Medicaid Act: 42 U.S.C. §§ 1396a(a)(10)(A) and 1396a(a)(43). DHHS moves to dismiss Count One as to each provision, but for separate reasons. The Court will discuss each in turn.

> 1. Plaintiffs Have Stated a Plausible Claim for Violations of Section 1396a(a)(10)(A).

Under the Medicaid Act, in relevant part, "[a] State plan for medical assistance must . . . provide--(A) for making medical assistance available, including at least the care and services listed in [specified paragraphs] of section 1396d(a) of this title" to qualifying individuals. 42 U.S.C. § 1396a(a)(10)(A). In turn, "medical assistance" is defined as "payment of part or all of the cost of the following care and services or the care and services themselves, or both . . . ." 42 U.S.C. § 1396d(a). Based on the use of the disjunctive "or" in this definition, DHHS argues that it is in compliance with section 1396a(a)(10)(A) if it provides services *or* is willing to pay for those services *or* both. (ECF 30, p. 3.) In other words, according to DHHS, it gets to choose. DHHS argues that, because it is willing to pay for EPSDT services, it has satisfied its statutory obligation even if Plaintiffs cannot find anyone to provide those services.

The legal premise of DHHS's argument is fine, as "the ordinary usage of the word 'or' is disjunctive, indicating an alternative." *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994). But the *purpose* of the disjunctive is a different question: did Congress use the word "or" in section 1396d(a) because it wanted to let DHHS choose how to comply with its statutory obligations, or does the word "or" instead signify that the phrase "medical assistance" means different things in different places in section 1396a? To answer this question, the Court cannot look at the definition of the phrase "medical assistance" in isolation; instead, it must "consider the statutory context in

which the words in question appear, including both 'the specific context in which the language is used, and the broader context of the statute as a whole.'" *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021) (cleaned up) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, (1997)), *cert. denied*, 142 S. Ct. 2888 (2022). Meaning: the Court must look at how "medical assistance" is used in the operative portions of section 1396a.

In conducting this analysis, it is important to take a step back and consider the remarkable length and scope of the statute. Section 1396a runs roughly 38,000 words and contains more than fifty subparts and hundreds (if not thousands) of sub-subparts. If section 1396a were a book, it would be approximately as long as *The Lion, the Witch, and the Wardrobe* and considerably longer than *The Old Man and the Sea* and *Of Mice and Men. See* Sarah S. David, *The Word Count of 175 Favorite Novels*, Broke by Books (May 11, 2019), https://brokebybooks.com/the-word-count-of-175-favorite-novels/. Given section 1396a's incredible length, it is easy to understand why the phrase "medical assistance"—which appears 280 times—might not have a single, uniform meaning throughout the statute.

Sure enough, DHHS's argument runs into problems once the phrase "medical assistance" is considered in its statutory context. Section 1396a(a)(10)(A) requires the State plan to "provide--(A) for making medical assistance available, including at least the care and services listed [elsewhere in the statute] . . . ." It is hard to conclude that a State has made "care and services" available when (as is alleged here) patients are not able to obtain the care and services. *See, e.g.*, *Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006) ("To receive federal approval, the Medicaid Act mandates that a plan include only seven enumerated medical services. A state may also elect to provide optional medical services, such as dental services, prosthetics, and prescription drugs." (internal citation omitted)). Thus, under section 1396a(a)(10)(A), it appears that willingness to pay is not enough to satisfy the State's obligation to make "medical assistance available." Instead, the State must also ensure the services are available in the first instance.

This conclusion is reinforced in other provisions of section 1396a(a) that similarly use the phrase "medical assistance" to refer to the availability of services, and not merely to payment. Subsection (a)(10)(C), for example, states that "medical assistance must include . . . ambulatory services" for children under 18 and "prenatal care and delivery services" for pregnant women. Subsection (a)(26) requires any State plan that "includes medical assistance for inpatient mental hospital services" to "provide, with respect to each patient receiving such services, for a regular

program of medical review (including medical evaluation) of his need for such services, and for a written plan of care . . . ." Subsection (a)(43)(A) requires persons under the age of 21 to be informed of the availability of "medical assistance including services described in section 1396d(a)(4)(B) . . . ." Subsection (a)(65) requires the State to issue provider numbers "for all suppliers of medical assistance consisting of durable medical equipment . . . ." Subsection (a)(86) allows the State to "mak[e] medical assistance available on an inpatient or outpatient basis at a residential pediatric recovery center . . . ." As used in these contexts, it would not make sense to interpret the phrase "medical assistance" as referring to a mere payment obligation.

To be sure, there are other subsections of section 1396a(a) where "medical assistance" *does* refer to a mere payment obligation. Subsection (a)(10)(F) allows the State to make "medical assistance available for COBRA premiums . . . ." Subsection (a)(10)(G)(XI) discusses the "making available of medical assistance to cover the costs of premiums, deductibles, coinsurance, and other cost-sharing obligations . . . ." Subsection (a)(10)(G)(XIX) addresses individuals who are "eligible for medical assistance consisting only of payment of premiums . . . ." Subsection (a)(18) imposes requirements on the State plan with respect to "medical assistance correctly paid . . . ." Subsection (a)(78) imposes obligations on a State that "pursuant to its State plan or waiver of the plan for medical assistance pays for medical assistance on a fee-for-service basis . . . ." In these contexts, it would not make sense to interpret the phrase "medical assistance" as referring to the mere provision of services.

The point, then, is that "medical assistance" means different things in different places in section 1396a. This brings the analysis back to the definitions in section 1396d(a). With the larger context in mind, it becomes clear that when Congress defined the phrase "medical assistance" to mean "payment of part or all of the cost of the following care and services *or* the care and services themselves, *or* both" (emphasis added), it was not giving a State a menu of choices for how to comply, with any one of the three doing the trick. Rather, Congress was simply recognizing that "medical assistance" does not mean the same thing in each of the 280 places where it appears in the 38,000-word statute. Sometimes it means "payment of part or all of the cost" of care and services; other times it means "the care and services themselves"; and still other times it means "both" payment *and* services. Hence the use of the disjunctive "or."

To figure out what "medical assistance" means in any particular place in section 1396a(a), you have to look *at that place*. As relevant here, and as noted above, the operative sentence of

section 1396a(a)(10)(A) requires the State to "provide . . . for making medical assistance available, including at least the care and services listed [elsewhere] . . . ." This provision requires the State to ensure the availability of the actual care and services, not just to be willing to pay if someone else happens to make them available. The Court rejects DHHS's contrary interpretation because it misunderstands why Congress used the word "or" in the definition of "medical assistance" in section 1396d(a).

"Numerous other courts" have reached the same conclusion, particularly in the aftermath of an amendment to the definition of "medical assistance" enacted by Congress in 2010. *Murphy by Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084, 1108 (D. Minn. 2017) (collecting cases). Prior to the amendment, "medical assistance" was defined in section 1396d(a) to mean only payment for services despite contextual clues in section 1396a(a) that Congress intended something else in some places. This incongruity led to a circuit split on what States were obligated to do. *Compare Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1158 (9th Cir. 2007) (requiring the State to make services available), *with Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003) (requiring only payment for services received), *overruled by O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), and *Westside Mothers v. Olzewski*, 454 F.3d 532, 540 (6th Cir. 2006) (same). With the 2010 amendment, "Congress intended to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." *O.B.*, 838 F.3d at 843 (quoting *A.H.R. v. Washington State Health Care Authority*, 469 F. Supp. 3d 1018, 1040 (W.D. Wash. 2016)); *see also Chisholm on Behalf of CC v. Gee*, No. CV 97-3274, 2017 WL 3730514, at *3 (E.D. La. Aug. 30, 2017) ("[T]he new language of the statute clarifies that medical assistance involves the provision of services.").

Because the meaning of "medical assistance" is unambiguous once it is considered in context, there is no need to consider legislative history. *See Designworks Homes*, 9 F.4th at 810 ("It goes without saying that legislative history cannot overcome the statutory text.") Nonetheless, "for those who find legislative history relevant," *id.*, the following language from the House Report speaks directly to the issue at hand and further undermines DHHS's position:

> ["Medical assistance"] is expressly defined to refer to payment but has generally been understood to refer to both the funds provided to pay for care and services and to the care and services themselves. . . . Some recent court opinions have, however, questioned the longstanding practice of using the term "medical assistance" to refer

> to both the payment for services and the provision of the services themselves. These opinions have read the term to refer only to payment; this reading makes some aspects of the rest of Title XIX difficult and, in at least one case, absurd. If the term meant only payments, the statutory requirement that medical assistance be furnished with reasonable promptness "to all eligible individuals" in a system in which virtually no beneficiaries receive direct payments from the state or federal governments would be nearly incomprehensible. . . . To correct any misunderstandings as to the meaning of the term, and to avoid additional litigation, the bill would . . . conform this definition to the longstanding administrative use and understanding of the term.

H.R. Rep. No. 111–299, pt. 1 at 649–50 (2009).

Most of the cases DHHS relies upon predate the 2010 amendment. For example, the Sixth Circuit decided *Westside Mothers v. Olzewski* approximately four years earlier, in 2006. 454 F.3d at 540. And while a subsequent Sixth Circuit case suggested in a footnote that *Westside Mothers*'s interpretation remained valid even after the amendment, see *John B. v. Goetz*, 626 F.3d 356, 360 n.2 (6th Cir. 2010), a more recent Sixth Circuit case refers to that footnote as "dictum" and says the court "ha[s] not issued an authoritative opinion determining whether *Westside Mothers II* controls the definition of 'medical assistance' under § 1396d(a) after Congress amended the statute, and district courts in our circuit have split on the issue." *Nored as next friends of Nored v. Tenn. Dep't of Intel. and Dev.*, No. 21-5826, 2022 WL 4115962, at *8 (6th Cir. Sept. 9, 2022). This Court will not give persuasive weight to dicta from a Sixth Circuit case that the Sixth Circuit itself later declined to endorse.

The Eighth Circuit has not directly addressed the pre- or post-amendment definition of "medical assistance." It has, however, held that a "State Plan must include the provision of EPSDT services as those services are defined in § 1396d(r)" and a "Medicaid-eligible individual has a federal right to early intervention day treatment when a physician recommends such a treatment." *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Hum. Servs.*, 293 F.3d 472, 480 (8th Cir. 2002) (concluding State must reimburse provider for services). In the same case, the Eighth Circuit "remind[ed]" a State that it "has a duty under 42 U.S.C. § 1396a[(a)](43) to inform Medicaid recipients about the EPSDT services that are available to them and that it must arrange for the corrective treatments prescribed by physicians." *Id.* at 481. This language strongly implies that the Eighth Circuit believes a State that chooses to participate in the Medicaid program has an obligation to ensure the availability of services, not simply to pay for them. Lower courts in this Circuit have reached this very conclusion when squarely presented with the question. *See Murphy*,

260 F. Supp. 3d at 1108 (denying motion to dismiss); *see also S.J. v. Tidball*, No. 2:20-CV-04036-MDH, 2020 WL 5440510, at *3 (W.D. Mo. Sept. 10, 2020) (same).[4]

Lest any doubt remain, other provisions of the Medicaid Act reinforce the conclusion that States sometimes must ensure the availability of services, and not just be willing to pay for them. For example, for States like Iowa that use MCOs, the Medicaid Act is replete with requirements for ensuring access to services. *See, e.g.*, 42 U.S.C. § 1396u-2(a)(3) (imposing minimum access requirements for rural and county residents). MCOs must also provide States with "adequate assurances . . . that the organization, with respect to a service area, has the capacity to serve the expected enrollment in such service area . . . ." 42 U.S.C. § 1396u-2(b)(5). This includes "assurances that the organization . . . offers an appropriate range of services and access to preventative and primary services for the population expected to be enrolled in such service area, and . . . maintains a sufficient number, mix, and geographic distribution of providers of services." *Id*. States may only use MCOs that meet these requirements. 42 U.S.C. § 1396u-2(a)(1)(A)(i). Interpreting section 1396a(a)(10)(A) to allow a State to discharge its Medicaid Act obligations without ensuring the availability of services "would contradict [the Court's] duty to harmonize related statutory provisions." *See Oil & Gas Transfer L.L.C. v. Karr*, 929 F.3d 949, 951 (8th Cir. 2019).

Finally, although the plain text of sections 1396a(a)(10)(A) and 1396d(a) is enough standing alone to require States both to pay for and ensure the availability of certain services, the Court notes that federal regulations implementing the Medicaid Act interpret the statutes the same way and require DHHS to make providers "available" for covered services:

> (a) The agency must provide referral assistance for treatment not covered by the plan, but found to be needed as a result of conditions disclosed during screening and diagnosis. This referral assistance must include giving the family or beneficiary the names, addresses, and telephone numbers of providers who have expressed a willingness to furnish uncovered services at little or no expense to the family.
>
> (b) The agency must make available a variety of individual and group providers qualified and willing to provide EPSDT services.

---

[4] So, too, have many courts in other circuits. *See O.B.*, F.3d at 843 (holding "the Medicaid Act requires the state to provide the required services with reasonable promptness"); *Fitzmorris v. Weaver*, No. 21-CV-25-PB, 2023 WL 2974245, at *2 (D.N.H. Apr. 17, 2023) (same); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1320–21 (W.D. Wash. 2015) (same); *Chisholm on Behalf of CC v. Gee*, No. CV 97-3274, 2017 WL 3730514, at *5 (E.D. La. Aug. 30, 2017) (same); *Ball v. Kasich*, 520 F. Supp. 3d 979, 987–88 (S.D. Ohio 2021) (same), *reconsideration denied*, No. 2:16-CV-282, 2022 WL 16926291 (S.D. Ohio Nov. 14, 2022); *Leonard v. Mackereth*, No. CIV.A. 11-7418, 2014 WL 512456, at *6–8 (E.D. Pa. Feb. 10, 2014) (same).

42 C.F.R. § 441.61. "[W]hen an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces, the interpretation receives deference if the statute is ambiguous and if the agency's interpretation is reasonable." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016). Thus, even if sections 1396a(a)(10)(A) and 1396d(a) were ambiguous, the interpretation set forth in section 441.61 would be entitled to deference and require the Court to reject DHHS's contrary interpretation.

For these reasons—but, principally, the plain language of the statute—the Court holds that Plaintiffs have stated a plausible claim for relief under 42 U.S.C. § 1396a(a)(10)(A).

2. Plaintiffs Have Stated a Plausible Claim for Violations of Section 1396a(a)(43).

In contrast to its argument under section 1396a(a)(10)(A), DHHS appears to acknowledge that section 1396a(a)(43) requires it to provide or arrange for services in some circumstances. (ECF 22-1, pp. 11–14.) Nonetheless, DHHS argues that Plaintiffs have failed to plead certain statutory prerequisites set forth in section 1396a(a)(43), which requires State plans to "provide for . . . providing or arranging for the provision of [EPSDT] screening services in all cases where they are requested, [and] arranging for . . . corrective treatment the need for which is disclosed by such child health screening services . . . ." Parsing the language, DHHS argues Plaintiffs are not entitled to treatment unless recommendations were made during an "EPSDT screening" requested through DHHS (or, presumably, an MCO). (ECF 22-1, p. 13; ECF 30, p. 9.) As Plaintiffs do not allege any request through DHHS for screening services, DHHS argues the Complaint does not state a claim for relief. (Id.)

DHHS's argument rests on an overly technical reading of the statute. DHHS does not appear to be arguing that Plaintiffs never received any "screening services," but rather that they did not follow the correct bureaucratic protocol for obtaining them. The implication is that there is a special kind of appointment for "screening services" that must be requested through DHHS before a Medicaid-eligible recipient is entitled to recommended treatment. The Eighth Circuit appears not to interpret the Medicaid Act so narrowly, instead stating that "a Medicaid-eligible individual has a federal right to . . . treatment when a physician recommends such treatment." *Pediatric Specialty Care*, 293 F.3d at 480; *see also Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006) ("Courts construing EPSDT requirements have ruled that so long as a competent medical provider finds specific care to be 'medically necessary' to improve or ameliorate a child's condition, the 1989 amendments to the Medicaid statute require a participating state to cover it.").

12

*Pediatric Specialty Care* is close enough to being on point that the Court likely would treat it as binding even if the Court were inclined to interpret section 1396a(a)(43) the same way as DHHS. As it is, however, the Court disagrees with DHHS's interpretation and concludes that section 1396a(a)(43) does not require a person to receive a recommendation for medical care in an appointment arranged through DHHS before that person is entitled to corrective treatment. Indeed, DHHS's interpretation of the statute essentially seeks to impose an extra bureaucratic layer on a program that contains enough bureaucracy as it is. *Cf. Pediatric Specialty Care*, 293 F.3d at 481 ("The state may not shirk its responsibilities to Medicaid recipients by burying information about available services in a complex bureaucratic scheme.").

The Court reaches this conclusion based on the plain language of section 1396a(a)(43). Subparts (A) and (B) require the State plan to "inform[]" all eligible individuals of the availability of EPSDT "screening, diagnostic, and treatment services" and to "provid[e] or arrang[e] for the provision of such screening services in all cases where they are requested." Read together, these provisions require DHHS to help an eligible person who asks for assistance in obtaining screening services. They do not, however, prohibit eligible persons who have obtained screening services on their own from getting the correctional treatment they need. Such persons have still "requested" screening services for purposes of the statute—they have simply made the request directly to the treating provider without needing DHHS's direct involvement. It is odd that DHHS would criticize this, as it means the State has done enough (at least as to those persons) to "inform" and "provid[e] for" screening services without occupying the time and energy of a DHHS or MCO employee in arranging the actual appointment. It follows, however, that DHHS is required under section 1396a(a)(43)(C) to "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services."

Under this interpretation of section 1396a(a)(43), Plaintiffs' Complaint does enough to state a plausible claim. Plaintiffs repeatedly allege that certain types of treatment were recommended by treating providers but not timely received, including intensive care coordination, intensive in-home therapeutic services, and crisis response services. (ECF 1, ¶¶ 22, 36, 50.) Plaintiffs also allege that they "sought" or "attempt[ed] to access" certain services but did not receive them to the degree they needed, including mobile crisis services, home and community-based skills training, and a limited care coordination program. (Id., ¶¶ 23–26, 39–40, 56.) Nothing

13

more is required to satisfy Fed. R. Civ. P. 12(b)(6). *See Rosie D.*, 410 F. Supp. at 26; *see also S.J.*, 2020 WL 5440510, at *3 (denying motion to dismiss when plaintiffs alleged defendants failed to provide necessary private duty nursing services defendant knew were necessary).

Granted, in its Reply Brief, DHHS appears to be making a related argument: it cannot have violated its statutory duties unless it knew the corrective treatment these three Plaintiffs needed and that they were not receiving that treatment in a timely fashion. Today's Order should not be interpreted as a definitive ruling on that issue. In its opening Brief, DHHS focused on the narrower issue of whether "screening services" had to be requested through DHHS before the eligible individual would be entitled to corrective treatment in accordance with section 1396a(a)(43)(C). Plaintiffs' response, in turn, focused solely on that narrower issue. The Court agrees with Plaintiffs on the narrower issue and thus rejects DHHS's position that section 1396a(a)(43)(C) *per se* does not apply unless a person requested screening services through DHHS. The Court will save for a later day the question of whether DHHS can be deemed to have violated section 1396a(a)(43)(C) if it did not know a person was not receiving needed corrective treatment.

    *C. Plaintiffs Have Stated a Plausible Claim that DHHS Did Not Provide Services with Reasonable Promptness.*

State plans must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals . . . ." 42 U.S.C. § 1396a(a)(8). Because the Court has already held that: (a) "medical assistance" encompasses both payment for services and provision of services in some contexts, and (b) the Complaint adequately alleges that Plaintiffs satisfied any prerequisites to receive such services, the only remaining question under section 1396a(a)(8) is whether Plaintiffs have stated a plausible claim that they were not provided those services "with reasonable promptness." The parties seem to agree that the Medicaid Act imposes no specific timeframe for the provision of services. (ECF 22-1, p. 15 ("Contrary to Plaintiffs' assertions, § 1396a(a)(8) does not require a participating state to provide services within a particular timeframe."); ECF 23, p. 14 ("The question of reasonable promptness is an individualized one . . . .").) In the absence of a bright-line rule, courts vary on what satisfies the reasonable promptness requirement. Some have found that being placed on a waitlist is a violation. *See Rosie D.*, 410 F. Supp. 2d at 27 ("Although the statute does not specifically define 'reasonable promptness,' courts facing this question have found defendants in violation of the provision when

14

eligible individuals are placed on waiting lists for medically necessary services." (collecting cases)). Others have adopted a more flexible standard. *See Murphy*, 260 F. Supp. 3d at 1107–08 ("[The Court disagrees that individuals must allege a particular length of delay to adequately state a violation of the reasonable promptness provision.").

Whatever the governing standard is, Plaintiffs have pled enough facts to satisfy it. They allege delays ranging from several weeks (ECF 1, ¶ 26) to years (id., ¶ 36(ii)). They allege they were put on waitlists for months. (Id., ¶¶ 24, 36(iii).) They even allege there are some services they *never* received because DHHS failed to ensure their availability. (Id., ¶¶ 23–25, 36–37, 51–54.) These allegations are sufficient to state a claim that DHHS failed to provide (or ensure the provision of) services with reasonable promptness. *See Murphy*, 260 F. Supp. 3d 1008 (denying motion to dismiss when plaintiffs alleged their guardians had asked about accessing services, in some cases "for a long time," but services were not provided); *Ball*, 520 F. Supp. 3d at 987–88 (same when plaintiffs alleged "they were never provided information about the availability of the medically necessary services"); *see also Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 711 (11th Cir. 1998) (affirming injunction requiring services to be provided within a reasonable time period when plaintiffs, in some cases, had endured "several years" of delay).

D.  *The Statute of Limitations Does Not Bar Plaintiffs' Claims.*

The statute of limitations generally does not apply to claims seeking prospective injunctive relief. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 343 (2017). A plaintiff is not "deemed to have permanently sacrificed his or her right to obtain injunctive relief merely because the statute of limitations has run as measured from the onset of the objected-to condition or policy." *Montin v. Est. of Johnson*, 636 F.3d 409, 415 (8th Cir. 2011). "This is particularly true where it is appropriate to describe each new day under an objected-to policy as comprising a new or continuing violation of rights . . . ." *Id.*

Setting aside statutory costs and attorney's fees, Plaintiffs seek only prospective injunctive relief. Nevertheless, DHHS contends a two-year statute of limitations should apply and "any of Plaintiff's [sic] claims which are dependent on events occurring prior to January 6, 2021, are barred . . . and should be dismissed." (ECF 22-1, p. 17.) This might be appropriate if Plaintiffs' request for an injunction was premised on a "discrete act" that took place outside the appropriate limitations period. *See Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1083 (8th Cir. 2018) (holding statute of limitations barred injunctive relief relating to "discrete act" occurring

several years prior). The Complaint, however, describes ongoing violations of Plaintiffs' rights as to the provision of EPSDT services. (E.g. ECF 1, ¶¶ 27, 42, 57.) The statute of limitations therefore does not bar Plaintiffs' claims. *See Montin*, 636 F.3d at 416 (holding continuing violations doctrine applied when plaintiff alleged ongoing, "daily" violations of his rights).

### III.   Conclusion

The Court concludes that 42 U.S.C. § 1396a(a)(10)(A) requires DHHS to ensure the availability of services, not just be willing to pay for them. It further concludes that Plaintiffs' Complaint states a plausible claim for relief under 42 U.S.C. § 1396a(a)(43) even if Plaintiffs did not request "screening services" through DHHS. Finally, it concludes that Plaintiffs state a plausible claim for relief based on DHHS's alleged failure to provide services with reasonable promptness, and that the statute of limitations is not a bar to relief. The Court therefore DENIES DHHS's Partial Motion to Dismiss (ECF 22).

**IT IS SO ORDERED.**

Dated: May 15, 2023.

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE