# EXHIBIT 1

<u>**SETTLEMENT AGREEMENT**</u>

## I. PURPOSE AND OBJECTIVES

1. The purpose of this Settlement Agreement (the "Agreement") is to ensure that Medicaid-eligible children in the State of Iowa under the age of twenty-one who have been determined by a licensed practitioner of the healing arts to have a serious emotional disturbance and for whom there is an assessment that intensive home and community-based services are needed to correct or ameliorate their condition, receive such services pursuant to Title XIX of the Social Security Act, and specifically the Early Periodic Screening, Diagnosis, and Treatment (EPSDT) provisions of the Medicaid Act, 42 U.S.C. §§ 1396d(r)(5), 1396a(a)(10)(A), 1396a(a)(43) and 1396d(a)(4)(B); Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, 28 C.F.R. § 35.130; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, 45 C.F.R. § 84.3 (Section 504).

2. The specific objective of this Agreement is the development and delivery of the intensive home and community-based mental health services defined in Appendix A of this Agreement to children in the Class statewide, as medically necessary, and consistent with the Parties' shared Goals and Principles described in Appendix B of this Agreement.

3. This Agreement includes three core components: goals and principles, commitments, and exit criteria. The goals are intended to provide structure and guidance for planning, implementation, and sustainability; aid in interpreting the meaning and purpose of the commitments and exit criteria; and guide future development of the service delivery system. The commitments are the actions that Defendant will take to implement the Agreement and achieve its objectives and intended results. Defendant will meet all of the commitments as set forth herein, and as further described in the attached Appendices and Amended Implementation Plan, during the pendency of this case. The exit criteria are the sole objective measures that, when accomplished, determine whether Defendant is in substantial compliance with the terms of this Settlement Agreement such that the case will then be dismissed.

## II. RECITALS

4. Plaintiffs commenced this lawsuit, entitled *C.A. v. Garcia* (Case No. 4:23-cv-00009-SHL-HCA, assigned to United States District Judge Stephen H. Locher), on January 6, 2023, seeking

declaratory and injunctive relief against Defendant Kelly Garcia, in her official capacity as Director of the Iowa Department of Health and Human Services (Iowa HHS). (ECF No. 1).

5. Defendant filed a partial motion to dismiss on February 13, 2023. (ECF No. 22). The Court denied this motion on May 15, 2023. (ECF No. 39). The Parties exchanged initial disclosures.

6. On June 27, 2023, the Parties jointly moved the Court for a stay of the litigation in order to proceed with court-sponsored mediation. (ECF No. 47). Between August 11 and September 15, 2023, the Parties engaged in settlement negotiations mediated by the Honorable Judge Walters.

7. On October 2, 2023, the Parties entered into an Interim Settlement Agreement. (ECF No. 63). The Interim Settlement Agreement was designed to establish a structure and process for the Parties to negotiate the terms of a Final Settlement Agreement.

8. The Court approved the Interim Settlement on October 12, 2023, certified the case as a class action, and approved a class of "all Medicaid-eligible children in the State of Iowa under the age of twenty-one, (i) who have been determined by a licensed practitioner of the healing arts as having a serious emotional disturbance, not attributable to an intellectual or developmental disability, and (ii) for whom there is an assessment that intensive home and community-based services are needed to correct or ameliorate their condition" (the "Class" or "Class Members"). (ECF No. 65).

9. Between October 2, 2023 and the present, the Parties engaged in extensive negotiations regarding a Final Settlement Agreement and the development of an incorporated Amended Implementation Plan (attached as Appendix C).

10. The Parties recognize that this litigation involves legal issues that may take a prolonged time to fully litigate and resolve, and further recognize that continued litigation would be expensive, lengthy, and time consuming.

11. The Parties agree that the best interests of the Class will be substantially advanced by the settlement of the litigation based on the commitments reflected in this Agreement, rather than by a trial on the merits.

12. The Parties share a mutual interest in seeing that intensive home and community-based mental health services are delivered to members of the Class, consistent with state and federal law.

Nothing in this Agreement is intended to, nor does it, impair the rights of any child to receive EPSDT services as mandated by state and federal law.

13. The Parties wish to enter into a settlement agreement as fully set forth herein.

## III. GOALS & PRINCIPLES

14. Defendant agrees to adhere to the Goals and Principles of the Agreement, as set forth in Appendix B, which will guide and inform the implementation of this Settlement Agreement.

## IV. COMMITMENTS

The Parties agree as follows:

### A. **The Relevant Services**

15. <u>Intensive Home and Community-Based Services</u>. Defendant will provide the following EPSDT-covered mental or behavioral health services to members of the Class who require them: (1) Intensive Care Coordination (ICC), (2) Intensive In-Home and Community Therapeutic Services (IHCTS), and (3) Mobile Crisis Intervention and Stabilization Services (MCIS). These services are defined in Appendix A of this Agreement.

16. <u>Waiver Services</u>. Defendant will provide additional Waiver Services, in conjunction with covered EPSDT services, to support members of the Class, help maintain them in their homes and communities, and avoid higher levels of care and out-of-home placements. These services are defined in Appendix A of this Agreement.

17. <u>Service Definitions</u>. Together, the Intensive Home and Community-Based Services and Waiver Services will be referred to as the "Relevant Services." Any services delivered pursuant to this Agreement will conform to the definitions laid out in Appendix A.

18. <u>Eligibility</u>. Defendant will utilize a standardized assessment process or processes, described in Paragraph 20 below, to assess putative Class Members' eligibility for the Relevant Services and to ensure consistency in access. Any member of the Class who has been determined eligible for the Relevant Services will be entitled to such services under the Settlement.

**B. The Amended Implementation Plan**

19. Defendant will execute the commitments and processes described in the Amended Implementation Plan, attached as Appendix C. Pursuant to the Amended Implementation Plan, Defendant will take the steps described therein to (a) ensure that the Relevant Services are available statewide and provided to all Class Members who meet the eligibility criteria; (b) ensure that Class Members eligible for the Relevant Services receive the full range of necessary mental or behavioral health services described in Appendix A; (c) utilize a standardized assessment tool and process(es) to ensure consistency in access to the Relevant Services; (d) improve and develop provider capacity and network adequacy to ensure access to all necessary Relevant Services for Class Members, including through oversight of the Managed Care Organizations (MCOs); (e) develop and employ a quality improvement and accountability framework to ensure the continued delivery and quality of the Relevant Services; and (f) develop and maintain a public data reporting mechanism regarding delivery of the Relevant Services.

**C. Eligibility Criteria**

20. As described in the Amended Implementation Plan, Defendant will identify and implement a standardized assessment process, or processes, to determine eligibility for the Relevant Services. By July 2026, Defendant will identify (a) an appropriate assessment tool(s); and (b) eligibility criteria. The final assessment tool(s), processes, and eligibility criteria will be subject to consent by the Plaintiffs and approval by the Independent Monitor.

21. The Eligibility Criteria will provide that, notwithstanding any other eligibility requirements, a Class Member may be eligible for any of the Relevant Services when a licensed practitioner of the healing arts has determined the service is needed to correct or ameliorate a behavioral health condition. Although an assessment tool may be used in screening eligibility, assessment scores will not be used as the sole basis for excluding a Class Member from receiving any Relevant Service when such Service has otherwise been found necessary to correct or ameliorate a behavioral health condition.

**D. Independent Monitor**

22. Defendant and Plaintiffs will choose a mutually agreeable Independent Monitor (the "Monitor"), who has substantial experience in the field of Medicaid and children's mental and behavioral health services, to support and evaluate the Department's progress toward implementing the requirements of this Agreement and the Amended Implementation Plan, and determine and validate whether the Department has complied with the requirements of this Agreement. Appointment of an agreed upon monitor is subject to the Court's approval. In the event the Independent Monitor resigns, becomes otherwise unavailable, or the Parties agree to retain another Independent Monitor, the Parties will work together to identify and agree on a replacement as soon as practicable. If the Parties cannot agree on an Independent Monitor, or a replacement, the Parties will proceed under the dispute resolution process described below.

23. On or before the 45th day after the date of the Monitor's appointment, the Monitor shall provide a Monitoring Plan to the Parties identifying the methodology that will be used to evaluate the commitments identified in this Agreement, the cadence of the methodology, the monitoring tools that will be used, and an explanation of how the methodology will measure compliance.

24. The Monitor will be authorized to conduct factual investigation and verification of Defendant's data and documentation in order to issue public reports on Defendant's performance under this Agreement and attached Amended Implementation Plan. These reports will be issued annually. The first monitoring report will be issued within eighteen months of the Court's final approval of this Agreement. At the end of a reporting period, the Monitor will provide a confidential draft report to the Parties, who will have twenty-one (21) days to submit comments to the Monitor on the draft before the report is filed with the Court. The final report will be filed with the Court within twenty-one (21) days of receiving the Parties' comments. The final report will be made publicly available on the Iowa HHS website.

25. In the final report(s) filed with the Court, the Monitor may include only such private health information necessary to provide context for the report. The Monitor will not include any identifier of the individual, the individual's relatives and household members, or the individual's guardian as specified in 45 C.F.R. § 164.514(b) (or any other identifiers or information that could be used to identify the individuals). If any identifiers are included in the report, the Defendant may redact that information before publishing the report.

26. The Department will provide the Monitor with reasonable access to all people, places, and documents necessary to assess the Department's compliance with the terms of this Agreement to the extent those people, places, and documents are within the Department's control. The Parties agree that the Monitor will have the authority to employ additional consultants or technical assistance if needed, subject to the approval of the Parties. The Parties shall not unreasonably withhold approval. Both the Monitor and any employees or sub-contractors will have access to all relevant data and information. The Monitor shall provide reasonable notice of any visit or inspection or request for access. Defendant and Plaintiffs will have access, through the Monitor, to all information utilized by the Monitor.

27. The Department will pay the reasonable fees and expenses of the Monitor and the Monitor's consultants or other individuals working for the Monitor. Within 60 days of appointment of the Monitor, the Monitor shall prepare and provide the Parties an initial budget based on the Monitoring Plan outlined in Paragraph 23. Within 14 days of receiving the budget, the Parties shall either object to or approve the budget. The Parties shall not unreasonably withhold approval. The Monitor shall prepare a new budget annually on or before the anniversary of the due date of the first budget. The Parties shall follow the same procedures for approval of each annual budget.

28. No Party will have supervisory authority over the Independent Monitor. The Parties will engage the Monitor and any sub-contractors at Defendant's expense.

**E.  Interim Benchmarks & Opting Out**

29. Interim Benchmarks.

(a)  Identification of the Class Member Size. After the Eligibility Criteria for each of the Relevant Services have been agreed upon (*see* Section C), the Defendant will, within 90 days, make a good faith, reasonable estimate of the number of children expected to meet those eligibility criteria and will propose, based upon this eligibility estimate, Interim Penetration Benchmarks, Interim Service Unit Benchmarks, and Interim Residential Setting Benchmarks, for each Interim Benchmark Date. The proposed Interim Benchmarks will be subject to Plaintiffs' consent and the approval of the

Independent Monitor. The Plaintiffs and Monitor shall not unreasonably withhold consent and approval.

(b) **Interim Benchmark Date** means, for each Relevant Service, the 180th day following the date upon which the Relevant Service has begun to be provided statewide, and each subsequent 180th day.

(c) **Interim Penetration Benchmark** means, for each category of Relevant Services (ICC, IHCTS, MCIS, and Waiver) the percent of eligible Class Members targeted to be receiving the services by the Interim Benchmark Date. The Interim Penetration Benchmark for IHCTS includes Class Members receiving any IHCTS and is not limited to Class Members receiving the minimum number of units under subsection (d).

(d) **Interim Service Unit Benchmark** means the percentage of eligible Class Members targeted to be receiving a minimum number of IHCTS units per child per month/year by the Interim Benchmark Date. The metric used to measure the minimum service units will be proposed and approved along with the Interim Service Unit Benchmarks, with input and agreement of the Parties and the Monitor.

(e) **Interim Residential Setting Benchmarks** include:

(i) The percentage of eligible Class Members placed in an in-patient or residential setting that were assessed by a licensed professional of the healing arts as requiring a level of care that could not be met in the community with Relevant Services.

(ii) The percentage of eligible Class Members that were placed in an in-patient or residential setting who were assessed and referred for Relevant Services upon discharge.

30. Opting Out.

(a) For the purposes of calculating whether the Defendant has met an Interim Benchmark, eligible Class Members who have opted out as defined in subsection (b) will not be included in the denominator of the percentage of Class Members receiving the particular services.

(b) An eligible Class Member opts out of Relevant Services if all of the following elements of an informed refusal are present:

(i)      The Class Member and their family have been provided detailed information about the nature of the Relevant Services, including what the services are designed to do, how the services should be delivered, and how families' needs can be accommodated in the design of the service plan.

(ii)     The information identified in subsection (i) has been provided on at least three separate occasions, including one in-person meeting.

(iii)    At the time the Class Member and their family first refuse the Relevant Services, they are provided written information explaining that notwithstanding the refusal, the family may request the services at any time in the future.

(iv)    Each time the Class Member and their family refuse the Relevant Services, the reason for their refusal must be documented in writing and retained in the record;

(v)     A supervisor must review the line personnel's documentation, including the reasons for refusal and affirm in writing that all information relevant to the family's decision has been provided.

(c)    Iowa HHS and its contractors shall track and review service refusals and reasons for refusals as part of their system oversight.

**F.   Reporting Requirements**

31. <u>Reporting Regarding the Relevant Services</u>. For each of the Relevant Services, beginning on the first Interim Benchmark Date, Defendant will report on a quarterly basis to the Independent Monitor and Plaintiffs' counsel, the following information: (a) the numbers and percentages of Class Members who meet the eligibility criteria for the Relevant Services; (b) the numbers and percentages of Class Members receiving each of the Relevant Services in the aggregate statewide, by geographic location, and by managed care plan; (c) the dollar expenditure for such services, per child (average dollars per child) and in the aggregate; (d) the denial, state fair hearing appeal, and success on appeal rates for each of the Relevant Services; and (e) for IHCTS and Waiver Services, the average number of units and units of each of the individual services delivered, per child, annualized.

32. <u>Reporting Regarding Placement in the Least Restrictive Setting</u>. Beginning within 90 days following the Court's final approval of this Agreement, Defendant will report on a quarterly basis to the Independent Monitor and Plaintiffs' counsel, the following information: (a) the numbers and percentages of Class Members who receive in-patient psychiatric treatment, residential treatment, or treatment in an emergency room or emergency department; (b) the dollar expenditure for such services, per child (average dollars per child) and in the aggregate; (c) the percentage of eligible Class Members placed in an in-patient or residential setting that were assessed by a licensed professional of the healing arts as no longer requiring an in-patient or residential level of care, including children who are there on administrative days; and (d) the percentage of eligible Class Members that were placed in an in-patient or residential setting who were assessed and referred for Relevant Services upon discharge.

33. <u>Demographic Data</u>. For each Relevant Service, beginning on the first Interim Benchmark Date, Defendant will report every six months to the Independent Monitor and Plaintiffs' counsel, the numbers and percentages of Class Members receiving the Relevant Services broken down by geographic location, managed care plan, age, gender, race, ethnicity, child welfare involvement, and special education involvement to the extent special education information is available.

34. <u>Public Reporting</u>. Beginning on the first Interim Benchmark Date for any of the Relevant Services, Defendant will develop and continue to maintain a publicly available data dashboard, updated quarterly. The data dashboard will provide information about Relevant Services for which statewide coverage has been implemented. Defendant will ensure that the dashboard shows statewide performance related to the provision of Relevant Services to Class Members, including the increase or decrease in utilization of the Relevant Services. The dashboard will provide specific claims or encounter data on the provision of each of the Relevant Services received by Class Members, broken down by geographic location, managed care plan, age, gender, race, ethnicity, child welfare involvement, and special education involvement to the extent special education information is available.

35. <u>Baseline Estimates</u>. Within six months of the entry of this Agreement, Defendant will prepare Baseline Estimates containing (a) the numbers and percentages of Class Members who are projected to meet the eligibility criteria for the Relevant Services; (b) the numbers and percentages

of Class Members who in the past year have received in-patient psychiatric treatment, residential treatment, or treatment/visits in an emergency room or emergency department, and (c) the current dollar expenditure for such services, per child and in the aggregate statewide. To the extent that such Baseline Estimates cannot be based on final eligibility criteria, Defendant will use proxy metrics to develop the Baseline Estimates, including but not limited to proxy metrics based on diagnoses, receipt of specified mental health services, in-patient psychiatric stays (including PRTFs and PMICs), and treatment/visits in an emergency room or emergency department.

## V. VALIDATION AND EXIT

### A. <u>Validation by the Independent Monitor</u>

36. <u>Validation of Amended Implementation</u>. The Independent Monitor will be responsible for validating whether Defendant has complied with the terms of this Agreement. Defendant's provision of the Relevant Services will be reviewed annually by the Independent Monitor who will determine whether the Relevant Services are being provided with fidelity to the service descriptions in Appendix A, and in a manner consistent with best practices, and whether they are available on a timely basis for Class Members eligible for the services.

37. <u>Data on Performance</u>. Defendant will provide the Independent Monitor and Plaintiffs' counsel, on a quarterly basis, with the performance measures, data, and supporting documentation set out in this Agreement, including Section IV above. Defendant will provide the Independent Monitor and Plaintiffs' counsel drafts of the written plans, policies, tools, measurement methodologies, reports, and other materials contemplated under this Agreement and under the Amended Implementation Plan, and the Independent Monitor and Plaintiffs' counsel will have a reasonable opportunity to comment on such materials before they are finalized or made available for public comment more generally. The Parties and the Independent Monitor will meet quarterly to review this information.

38. <u>Validation of Defendant's Compliance</u>. As a condition for Exit under Section V.B below, the Independent Monitor will verify Defendant's compliance with the terms of this Settlement Agreement. Defendant will provide the Independent Monitor and Plaintiffs' counsel with documentation evidencing Defendant's compliance and provide the Independent Monitor and

Plaintiffs' counsel with such additional information, data, and documentation reasonably necessary to verify compliance. Defendant will respond promptly to requests for additional information, data and documentation, with any disputes to be resolved in accordance with Section VI below.

39. Corrective Action. In the event that (a) Defendant fails to meet any Interim Benchmarks, or (b) the Monitor's annual report determines that the Relevant Services are not being provided on a timely basis, in substantial conformance with the service descriptions set out in Appendix A or in a manner consistent with best practices, Defendant will develop and implement a plan for corrective action, in consultation with the Independent Monitor and Plaintiffs' counsel.

## B.  **Exit Procedure**

40. The Parties anticipate Defendant will complete implementation of this Agreement on or about December 31, 2032, and that the Parties' obligations herein will terminate, if at that time Defendant demonstrates they have substantially complied with the exit criteria below. At that time, the exit criteria set forth in Section VI.C will be the sole objective measures that, when accomplished, will indicate that Defendant is in substantial compliance with the terms of this Agreement such that the lawsuit herein will be dismissed.

41. On or about nine months prior to the date implementation is anticipated to be completed, whichever is sooner, the Parties will meet to determine whether there is any dispute as to whether the Defendant is on track to meet the exit criteria.

42. Notwithstanding Paragraphs 40 and 41, before completion of full implementation of all exit criteria in the Settlement Agreement, the Defendant may seek a determination of substantial compliance with any specific substantive paragraph or subparagraph of Section VI.C of this Agreement if it has attained and maintained substantial compliance with the corresponding exit criteria of that specific provision for at least one year. The Defendant may seek such determination by filing an appropriate motion. Prior to filing such a motion, the Defendant will engage in the dispute resolution process described in Section VI.

## C. **Exit Criteria**

The exit criteria set forth below will be the sole objective measures that, when accomplished, will indicate that Defendant is in substantial compliance with the terms of this Agreement:

Service Delivery Exit Criteria

43. Defendant:

a) Has identified and adopted a standardized and appropriate assessment tool(s) to identify putative Class Members for possible eligibility for Intensive Home and Community-Based Services;

b) Has identified and adopted a standardized and appropriate assessment tool or process to identify putative Class Members for possible eligibility for Waiver Services;

c) Has adopted and is using consistent procedures statewide to assess, refer, and link putative Class Members who meet eligibility criteria to the Relevant Services, and measure and communicate outcomes for Class Members using the Relevant Services;

d) Is providing the Relevant Services statewide to Class Members who meet the eligibility criteria and have not opted out of receiving the Relevant Services;

e) Demonstrates statewide network adequacy for the Relevant Services for Class Members for whom they are medically necessary;

f) Is providing standardized education and training on processes and tools for identification and referral of putative Class Members to the Relevant Services; and

g) Has developed and is providing accessible information about the Relevant Services to putative Class Members, their families, and other stakeholders.

Implementation Plan Exit Criteria

44. Defendant:

a) Has implemented and substantially complied with the processes, timelines, and action steps laid out in the Amended Implementation Plan.

Final Benchmarks Exit Criteria

45. Defendant:

a) Has met and sustained the Final Benchmarks for a period of one year after the Final Benchmark Date, and the Independent Monitor has confirmed that, for one year, the Relevant Services have been provided in a timely manner, in substantial conformance with the service descriptions set out in Appendix A. In determining compliance with the Final Benchmarks required as Exit Criteria, the Parties, in consultation with the Monitor, will determine appropriate timely access standards for the Relevant Services that account for the urgency of need for each Relevant Service as well as the Network Adequacy time and distance standards required in 42 CFR Sections 438.68 and 438.206 of federal Medicaid Managed Care regulations.

b) Concurrently with the timeline for proposing Interim Benchmarks under Paragraph 29, the Parties will establish Final Benchmarks to be met by the Final Benchmark Date. The final benchmarks will be set at a level that provides reasonable assurance that the Relevant Services are being sufficiently provided to the population of Medicaid-eligible children for whom such services are medically-necessary, and are being provided timely and with the required intensity. The proposed Final Benchmarks will be subject to the approval of the Independent Monitor. The Monitor shall not unreasonably withhold approval.

c) **Final Benchmark Date** means, for each Relevant Service, the date the Parties have agreed the Defendant will meet the Final Benchmarks Exit Criteria. The Final Benchmark date will be determined concurrently with identification of the Final Benchmarks, and will be no later than December 31, 2031.

d) **Final Penetration Benchmark** means, for each category of Relevant Services (ICC, IHCTS, MCIS, and Waiver), the percent of eligible Class Members targeted to be receiving the services by the Final Benchmark Date. The Final Benchmark for IHCTS

includes Class Members receiving any IHCTS and is not limited to Class Members receiving the minimum number of units under subsection (e).

e) **Final Service Unit Benchmark** means the percentage of eligible Class Members targeted to be receiving a minimum number of IHCTS units per child per month/year by the Final Benchmark Date. The metric used to measure the minimum service units will be the same metric agreed upon under the process of Paragraph 29(d).

f) **Final Residential Settings Benchmarks** will be used to measure success in placing members in the least restrictive setting. Final Settings Benchmarks include:

   (i) The percentage of eligible Class Members placed in an in-patient or residential setting that were assessed by a licensed professional of the healing arts as requiring a level of care that could not be met in the community with Relevant Services.

   (ii) The percentage of eligible Class Members that were placed in an in-patient or residential setting who were assessed and referred to Relevant Services upon discharge.

g) For the purposes of calculating whether the Defendant has met Final Benchmarks, eligible Class Members who have opted out of the Relevant Services as defined in Paragraph 30 will not be included in the denominator of the percentage of Class Members receiving the Relevant Services.

<u>Data and Quality Management Exit Criteria</u>

46. Defendant:

a) Has developed and is using a Quality Improvement and Accountability plan.

b) Is operating a quality assurance system consistent with the Quality Improvement and Accountability plan.

c) Measures and reports quarterly on a public data dashboard(s) statewide performance related to the provision of Relevant Services to Class Members, including the number of Class Members who are identified, screened, assessed, and receive or are denied the Relevant Services, and reflecting utilization of the Relevant Services by geographic location, managed care plan, and children's race/ethnicity and age, child welfare involvement, and special education involvement.

## VI. DISPUTE RESOLUTION AND ENFORCEMENT MECHANISMS

### A. **Process**

All disputes arising out of or in connection with the Settlement Agreement will be resolved as set out in this Section.

47. Notice of Dispute. To invoke the dispute resolution and enforcement mechanisms in this subsection, the Party seeking dispute resolution will provide written notice of the dispute to the opposing Party and request a meet and confer. The request for a meet and confer will include a written description of the items for dispute resolution under this subsection.

48. Meet and confer. Within fourteen (14) days of notice of a Party's request for dispute resolution, unless another time is agreed by the Parties, the Parties agree to convene at a mutually agreeable time and place, and use their good-faith, best efforts to discuss and resolve the dispute. The initial meeting will be a direct negotiation between the Parties without the assistance of a mediator or other non-party.

49. Mediation Process. If the Parties are unable to resolve the dispute within thirty (30) days, following the meet and confer, or such other time frame to which the Parties agree, they will engage the services of a mutually agreeable mediator for the purpose of mediating a resolution to the dispute, to be engaged at Defendant's expense. The Parties agree that Kathleen Noonan will serve as the agreed-upon mediator for purposes of dispute resolution. If Kathleen Noonan is not able to serve as mediator, the Parties will engage the services of another mutually-agreeable mediator. The meeting will be at a mutually agreeable time and place, and, with the assistance of the mediator, the Parties will use their good-faith, best efforts to discuss and resolve the dispute.

50. <u>Amendments to Agreement.</u> Any agreement reached through the meet and confer or mediation process that either Party believes is a material amendment to or modification of the Agreement will be formalized as an addendum to the Parties' Agreement and submitted to the District Court for approval.

51. The Parties agree to engage in the dispute resolution process described above prior to filing any motion with the Court. If, after negotiating in good faith, including through mediation, no resolution is reached, either Party may file an appropriate motion with the District Court in this matter. The moving Party will provide 20 days prior notice to the opposing Party of such motion.

52. <u>Expedited dispute resolution.</u> In the event that Plaintiffs' counsel reasonably believes that there is a systemic risk of imminent harm to a broad group of Class Members as a result of Defendant's material noncompliance with their systemic obligations under this Agreement, Plaintiffs' counsel will make a good-faith effort to consult with the Defendant's counsel to discuss the potential harm resulting from an alleged failure to meet their systemic obligations. A "systemic obligation" is one that may affect all of, or a substantial portion of, the Class Members and is not represented or proven by a circumstance or condition affecting an individual Class Member. If the issue or issues are not resolved within 10 days, or a longer period of time agreed to by the Parties, the Parties may engage in an expedited mediation process. If an appropriately expedited dispute resolution process cannot be scheduled, or the systemic matter is not resolved through mediation, Plaintiffs' counsel may proceed directly to the District Court or make take any other necessary legal action. Plaintiffs' counsel will provide at least one (1) business day's written notice to Defendant's counsel via electronic mail and first-class mail prior to initiating court action.

## VII. COURT APPROVAL

53. The United States District Court has jurisdiction over the claims against the Defendant pursuant to 28 U.S.C. §§ 1331, 1343(a). Venue is proper in the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b).

54. This Agreement settles all claims against Defendant in this lawsuit.

55. As soon as practical after the date of this Agreement, the Parties will file a joint or unopposed motion seeking preliminary approval of this Agreement. The motion will request that

the Court set a schedule for a fairness hearing on the settlement, a process for providing notice to interested parties, and a schedule for moving for a judgment and order granting final approval of the Agreement. The Parties will use their best efforts to cause this Settlement Agreement to receive final approval from the Court.

56. The parties' proposed judgment and order granting final approval of this settlement will:

a) Grant final approval of the Settlement Agreement without modification of its terms as fair, reasonable, and adequate to the Class under Fed. R. Civ. P. 23(e);

b) Find that the Settlement Agreement resulted from extensive arm's length, good faith negotiations between the Parties through experienced counsel;

c) Comply with the content and scope requirements of Fed. R. Civ. P. 65(d)(1), expressly incorporate the actual terms of this Settlement Agreement, and make the Parties' compliance with the terms of this Settlement Agreement part of the order;

d) Include a finding that by agreeing to settle the action, Defendant does not admit, and specifically deny, any and all liability in the action; and

e) Incorporate the entirety of the express terms of the Settlement Agreement and provide that the Court has and will retain jurisdiction over the judgment and order to enforce the Settlement Agreement.

57. This Settlement Agreement will be effective on the date of final approval by the Court.

## VIII. MISCELLANEOUS

58. <u>Attorney Fees and Costs</u>. Upon entry of this Agreement, Plaintiffs will be deemed a prevailing party and the reasonableness of attorneys' fees, costs and expenses awarded may include a determination of the level of success and benefit achieved by Plaintiffs in connection with this Litigation. Plaintiffs can also seek reasonable attorneys' fees and costs for monitoring and enforcement of a Final Settlement Agreement and Consent Decree.

59. <u>Release of Claims</u>. If the Court grants final approval of this Settlement Agreement, Plaintiffs will be deemed to have released all pending claims for class wide declarative or injunctive relief based upon the facts asserted in the Complaint against Defendant.

60. <u>Confidentiality Order</u>. The Protective Order entered in this case (ECF No. 29) will remain in full force and effect until the Court enters an order granting final termination of jurisdiction over and exit from the Settlement Agreement and the final judgment and order. All communications concerning the negotiation of the Settlement Agreement, including but not limited to, its content or any details conveyed to or by the Parties during its negotiation are confidential. Nothing in this Settlement Agreement prohibits or restricts any Party or their representatives from publicly communicating the fact that the Parties have entered a Settlement Agreement. The Parties acknowledge that the terms of the Settlement Agreement will be made public when the settlement is filed with the Court.

61. <u>Funding</u>. Iowa HHS, while empowered to enter into and implement this Agreement, does not have the legal authority to bind the Iowa General Assembly, which has the authority under the Iowa Constitution and laws to appropriate funds for, and amend laws pertaining to, the Defendant's system of services for the Class. Defendant will make all reasonable efforts to obtain funding and resources to fulfill the terms of this Agreement. At least annually after Court approval of this Agreement, and consistent with existing state budgetary practices and legal requirements, Defendant will request state funds sufficient to effect the terms set forth in this Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of state government. Defendant will also maximize all available federal funding opportunities.

62. <u>Governing Law</u>. Federal law governs this Settlement Agreement.

63. <u>Counterparts</u>. This Settlement Agreement may be executed in counterparts, each of which will be deemed to be an original, but all of which, taken together, will constitute one and the same agreement. Execution by facsimile, by scanned attachments, or by electronic signature has the same force and effect as an original.

64. <u>Severability</u>. Each of the provisions in this Settlement Agreement is separately and independently enforceable. Every position in this Settlement Agreement applies to all Class Members.

65. The obligations of Defendant are binding regardless of whether they are performed, delivered, implemented, or managed directly by Defendant or by grantees, subcontractors, or agents.

66. <u>Successors and Assigns</u>. This Settlement Agreement binds and inures to the benefit of the successors and assigns of the Parties, including any agency or agencies with any of the responsibilities of Iowa HHS.

67. <u>Entire Agreement</u>. This Settlement Agreement is the final and exclusive agreement between the Parties with respect to its subject matter.

68. <u>Modification</u>. Before the final judgment and order of the Court, no amendment to this Agreement will be effective unless it is in writing and signed by the Parties. After the final judgment and order, no modification of this Agreement will be effective unless it is in writing, signed by the Parties, and approved by the Court.

69. The Parties and their counsel have each contributed to the preparation of this Settlement Agreement. No provision will be construed against a Party on the ground that one of the Parties or their counsel drafted the provision.

70. Each signatory states that they are fully authorized to execute this Settlement Agreement on behalf of the Party for which he or she signs.

71. The Parties agree those materials contained in the appendices to this Agreement, as referenced in the main body of the Agreement, are included and fully incorporated into this Agreement as if fully set forth herein.

72. This Agreement contains all the terms and conditions agreed upon by the Parties. No other understandings, oral or otherwise, regarding the subject matter of this Agreement will be deemed to exist or to bind any of the Parties hereto.

73. Nothing in this Settlement Agreement will limit the ability of any individual Plaintiff or putative Class Member to pursue any legal or administrative remedies to which they would otherwise be entitled under state or federal law other than for the claims for systemic injunctive relief adjudicated by this action.

74. Nothing in this Agreement will be deemed to limit the Court's powers of contempt or any other power possessed by the Court.

75. Nothing in this Settlement Agreement will be deemed to limit the ability of Disability Rights Iowa to fulfill its federal mandates pursuant to the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. § 10801, *et seq.*, and the regulations promulgated thereto, 42 C.F.R. § 51, *et seq.*, the Developmental Disabilities Assistance and Bill of Rights (DD) Act, 42 U.S.C. §15041, *et seq.*, and the regulations promulgated thereto, 45 C.F.R. § 1326, *et seq.*, and the Rehabilitation Act Amendments of 1992, 29 U.S.C. § 794e.

**FOR AND ON BEHALF OF THE DEFENDANT:**

By: _Kelly Theis_                    Dated: _12/20/2024_

Kelly Garcia
Director
Iowa Department of Health and Human Services
321 East 12th Street
Des Moines, Iowa 50319

By: _____           Dated: _____

Brenna Bird
Attorney General of Iowa

**FOR AND ON BEHALF OF THE DEFENDANT:**

By: _____          Dated: ____  ____

Kelly Garcia
Director
Iowa Department of Health and Human Services
321 East 12th Street
Des Moines, Iowa 50319

By: _Brenny Bird_          Dated: _12/19/24_

Brenna Bird
Attorney General of Iowa

**FOR AND ON BEHALF OF PLAINTIFFS:**

By: _____ Dated: 12/23/24
Catherine Johnson
Cynthia A. Miller
DISABILITY RIGHTS IOWA
666 Walnut St., 1440
Des Moines, IA 50309

By: _____ Dated: 12/21/2024
Harry Frischer
Stephanie Persson
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, New York 10005

By: _____ Dated: 12/20/24
Kimberly Lewis
M. Geron Gadd
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514

By: _____ Dated: 1/6/25
Timothy R. Farrell
ROPES & GRAY LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606

# APPENDIX A

# APPENDIX A

## Intensive Child and Adolescent Services, the "Relevant Services" for the Defined Class

## A. Intensive Home and Community-Based Services

### 1. Intensive Care Coordination

Intensive Care Coordination (ICC) includes facilitating assessment, care planning, coordination of services, authorization of services, and monitoring of services and supports to address children's health conditions by a single, consistent care coordinator.

Intensive Care Coordination provides:

- A single point of accountability for ensuring that medically necessary Medicaid services are accessed, coordinated, and delivered in a strength-based, individualized, family-driven, child-guided culturally and linguistically relevant manner;

- Services and supports that are guided by the needs of the child;

- Facilitation of a collaborative relationship among a child, the family, and child-serving systems;

- Support for the parent/caregiver in meeting the child's needs;

- A care planning process that ensures that a care coordinator organizes and matches care across providers and child-serving systems to allow the child to be served in the home and community; and

- Facilitated development of an individual's care planning team (CPT). Teaming is a process that brings together individuals selected by the child and family who are committed to them through informal, formal, and community support and service relationships. ICC will facilitate cross-system involvement and a formal child and family team.

ICC service components consist of:

*Assessment:* Iowa HHS will implement its care planning team process, which includes
- completing a strengths-based, needs driven, comprehensive assessment to organize and guide the development of a Care Plan and a risk management/safety plan;
- an assessment process that determines the needs of the child for medical, educational, social, behavioral health, or other services;
- an ICC that may also include the planning and coordination of urgent needs before the comprehensive assessment is completed;

- further assessments that are provided as medically necessary and in accordance with best practice protocols.

*Planning and Development of a Family-Driven, Child-Guided, Person-Centered Plan (PCP):* Iowa HHS will maintain a family-driven, child-guided, person-centered planning process, which includes:
- having the care coordinator use the information collected through an assessment, to convene and facilitate the CPT meetings;
- having the CPT develop a child-guided and family-driven PCP that specifies the goals and actions to address the medical, educational, social, mental health, and other services needed by the child and family; and
- ensuring that the care coordinator works directly with the child, the family, and others significant to the child to identify strengths and needs of the child and family, and to develop a plan for meeting those needs and goals.

*Crisis Planning.* The Care Coordinator will provide crisis planning that, based on the child's history and needs, (a) anticipates the types of crises that may occur, (b) identifies potential precipitants and creates a crisis plan to reduce or eliminate them, and (c) establishes responsive strategies by caregivers and members of the child's team to minimize crises and ensure safety;

*Referral, monitoring, and related activities:* Iowa HHS will require that the care coordinator:

- works directly with the child and family to implement elements of the PCP;
- prepares, monitors, and modifies the PCP in concert with the CPT and determines whether services are being provided in accordance with the PCP; whether services in the PCP are adequate; and whether there are changes in the needs or status of the child and, if so, adjusts the PCP as necessary, in concert with the CPT; and
- actively assists the child and family to obtain and monitor the delivery of available services, including medical, behavioral health, social, therapeutic, and other services.

*Transition:* Iowa HHS will require the care coordinator to:

- develop a transition plan with the CPT, and implement such plan when the child has achieved the goals of the PCP; and
- collaborate with the other service providers and agencies on behalf of the child and family.

*Settings:* ICC may be provided to children living and receiving services at home and in the community, including foster care placements, as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge or transition planning. Notwithstanding the foregoing, ICC will not be provided to children in juvenile detention centers.

## 2.    Intensive In-Home and Community Therapeutic Services (IHCTS)

Intensive In-Home and Community Therapeutic Services (IHCTS) are individualized, strength-based interventions to correct or ameliorate behavioral health conditions that interfere with a child's functioning. Interventions help the child to build skills necessary for successful functioning in the home and community and improve the family's or caregiver's ability to help the child successfully function in the home and community.

IHCTS are delivered according to a care plan developed by the CPT. The CPT develops goals and objectives for all life domains in which the child's behavioral health condition causes impaired functioning, including family life, community life, education, vocation, and independent living, and identifies the specific interventions that will be implemented to meet those goals and objectives.

The goals and objectives seek to maximize the child's ability to live and participate in the community and to function independently, including through building social, communication, behavioral, and basic living skills. Providers of IHCTS should engage the child and other family members or caregivers in home and community activities where the child has an opportunity to work towards identified goals and objectives in a natural setting. The provision of IHCTS does not include the prescription of medications, including psychotropic medications or hormone-based therapies.

Phone contact and consultation may be provided as part of the service.

IHCTS include, but are not limited to:

- Educating the child's family about, and training the family in managing, the child's needs;

- In-home functional behavioral assessments, as needed;

- Behavior management, including developing and implementing a behavioral plan with positive behavioral interventions and supports, modeling for the child's family and others how to implement behavioral strategies, and in-home behavioral aides who assist in implementing the behavior plan, monitoring its effectiveness, and reporting on the plan's effectiveness to clinical professionals;

- Therapeutic services delivered in the child's home and community, including but not limited to therapeutic interventions such as (a) individual and/or family therapy, and (b) evidence-based practices (*e.g.*, Family Functional Therapy, Multisystemic Therapy, Trauma-Focused Cognitive Behavioral Therapy, etc.). These services:

  o   Improve self-care, including addressing behaviors and social skills deficits that interfere with daily living tasks and avoiding exploitation by others;

  o   Improve self-management of symptoms, including assisting with self-administration of medications;

o Improve social functioning, including addressing social skills deficits and anger management;

o Support the development and maintenance of social support networks and the use of community resources;

o Support employment objectives by identifying and addressing behaviors that interfere with seeking and maintaining a job;

o Support educational objectives, including identifying and addressing behaviors that interfere with succeeding in an academic program in the community; and

o Support independent living objectives by identifying and addressing behaviors that interfere with seeking and maintaining housing and living independently.

*Settings:* IHCTS may be provided to children living and receiving services at home and in the community, including foster care placements, as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge or transition planning. Notwithstanding the foregoing, IHCTS will not be provided to children in juvenile detention centers.

*Providers*: IHCTS are provided by a qualified provider.

### 3. Mobile Crisis Intervention and Stabilization Services (MCIS)

Mobile crisis services (MCIS) include crisis planning and prevention services, as well as face-to-face interventions that support the child in the home and community.

Services include, but are not limited to:

- Responding to the immediate crisis and assessing child and family safety, and what kinds of resources are available to address immediate problems.

- Stabilization of functioning by reducing or eliminating immediate stressors and providing counseling to assist in de-escalating behaviors and interactions;

- Referral and coordination with (a) other services and supports necessary to continue stabilization or prevent future crises from reoccurring, and (b) any current providers and team members, including the care coordinator, therapists, family members, primary care practitioners, and school personnel; and

- Post-crisis follow-up services (stabilization services) in compliance with state regulations and timeframes.

*Settings:* During a crisis, MCIS should be provided at the location where the crisis is occurring, including the home (biological, foster, relative, or adoptive) or any other setting where the child is naturally located, including schools, recreational settings, child care centers, and other community settings.

*Availability:* MCIS are available 24 hours a day, seven days a week, 365 days a year.

*Providers:* Pre-crisis planning and post-crisis services are typically provided by qualified providers drawn from members of the CPT as part of the provision of ICC and IHTS. During the crisis, MCIS are provided by a trained and experienced mobile crisis professional or team. Sufficient MCIS providers to meet the expected needs of members of the Defined Class should be available. MCIS providers may include paraprofessionals.

## B. Waiver Services to Ensure Placement in Least Restrictive Setting

Additional Medicaid waiver services are used in conjunction with covered EPSDT services to support children with serious emotional disturbances and to help maintain them in their homes and communities and avoid higher levels of care and out-of-home placements. These services are currently authorized through a waiver under Section 1915(c) of the Social Security Act, allowing Iowa to spend federal Medicaid dollars on these services. Like IHCBS, these services improve the family's or caregiver's ability to help the child successfully function in the home and community, and help the child to build skills necessary for successful functioning in the home and community. Such services could include, but are not limited to, respite care and other services or supports not required to be covered under Medicaid EPSDT provisions.

Children receiving such services must have an individualized service plan (ISP) developed collaboratively with an interdisciplinary team (IDT). This plan documents the agreed upon goals, objectives, and service activities. The ISP must be reviewed and updated annually. The interdisciplinary team (IDT) consists of the child, the child's parents or legal guardians, case manager, mental health professionals, and any other persons that the child and family choose to include. The team meets to plan the supports a child and family need to safely maintain the child in the home.

# APPENDIX B

# APPENDIX B

## <u>Goals and Principles</u>

1. The Goals of the Interim Agreement include, as they pertain to the members of the Defined Class:

   a. Identifying the intensive home and community-based service array (hereinafter referred to as the "Relevant Services") to be provided. The Relevant Services are described generally in Appendix A.

   b. Identifying the population to be served, the procedures for determining eligibility, how Medicaid-eligible beneficiaries access mental health care services and supports, the locations in which Medicaid beneficiaries receive these services and supports, and how to monitor and enforce the fulfillment of the Defendant's obligation to provide these services and supports.

   c. Establishing practices and procedures to promote improved collaboration and coordination by child-serving agencies, state agencies, counties, and providers that deliver care to Medicaid-eligible children with mental or behavioral health disorders, thereby improving the effectiveness of services to, and the outcomes of, families and children. Improving collaboration will also reduce duplication and waste, and lower costs.

   d. Establishing practices and procedures to reduce the fragmentation of services.

   e. Establishing consistent statewide screening, assessment, and referral procedures that will facilitate access to the Relevant Services, regardless of entry point, for all Medicaid-eligible children with mental or behavioral health disorders. It is the expectation of the Parties that a Medicaid-eligible child with mental or behavioral health disorders will be appropriately screened and, if necessary, assessed for the Relevant Services regardless of the initial point of contact, after which the child will be referred to the appropriate agency for provision of the Relevant Services.

   f. Providing the foundation for the statewide provision of behavioral health services consistent with the Principles under this Interim Agreement and developing and maintaining a comprehensive service array in order to provide members of the class with timely access to medically necessary and other home and community-based mental health services.

   g. Ensuring that Medicaid-eligible children receive mental health services in the most integrated setting appropriate to their needs and are free from serious risks of segregation and institutionalization, including the unnecessary use of out-of-home placements.

   h. Making systemic changes to ensure that the services and supports that are necessary to maximize the success and development of Medicaid-eligible children and adolescents with behavioral health disorders into healthy and independent adults are timely provided.

   i. Ensuring that children experiencing mental health crises receive an appropriate and effective response centered on addressing the underlying mental health issues at the place where the

child is located, and are not being relegated to law enforcement personnel and hospital emergency rooms.

j. Identifying and developing quality management tools and measures to monitor, provide, and improve quality of care, and to provide transparency and accountability to, and the involvement of, families, children, providers, advocacy organizations, and others with interest in the provision of behavioral health services.

k. Identifying and developing plans to address the specific service deficiencies that affect underserved communities, including specific populations having specialized needs, which include, but are not limited to, BIPOC (Black, Indigenous, and people of color) and LGBTQIA+ populations.

l. Identifying and developing measurable and enforceable standards to determine whether the State is fulfilling its obligation to provide necessary services and supports to Medicaid beneficiaries.

m. Identifying and developing reforms that maximize the effectiveness and efficiency of state resources in accordance with the Commitments outlined in this Interim Agreement.

2. The Parties shall be guided by the following Principles in connection with their implementation of this Interim Agreement, negotiation of a Final Settlement Agreement, and implementation of the terms of the Final Settlement Agreement. These broad Principles have been developed by the National Wraparound Initiative and describe a set of child and family-centered values and principles that shall inform and guide the management and delivery of the Relevant Services:

a. **Child Centered and Family Driven**: Family and child voice, choice, and preferences are intentionally elicited and prioritized during all phases of the process, including planning, delivery, transition, and evaluation of services. Services and interventions are family-driven and child-guided from the first contact with or about the family or child. Services and interventions also seek to reduce the burden placed on parents and caregivers in arranging, seeking out, and coordinating services.

b. **Team-based**: Services and supports are planned and delivered through a multi-agency, collaborative teaming approach, referred to as a "child and family team." Team members are chosen in conjunction with the family and connected to them through natural, community, and formal support and service relationships. The team works together to develop and implement a plan to address unmet needs and work toward the family's vision.

c. **Natural Supports**: The team actively seeks out and encourages the full participation of team members drawn from family members' networks of relationships (*e.g.*, friends, neighbors, community, and faith-based organizations). The care plan reflects activities and interventions that draw on sources of natural support to promote recovery and resiliency. However, implementation of the plan is not dependent on the availability of natural supports. Parents, guardians, and caregiver support and cooperation are key to the successful delivery of services to the Defined Class members in the least restrictive setting.

d. **Collaboration**: The system responds effectively to the behavioral health needs of multi-system involved children and their caregivers, including children in child welfare, juvenile justice, behavioral health and developmental disabilities, substance use, primary care, and education systems. Delay in service should not occur as a result of questioning who is the responsible payor.

e. **Home and Community-based**: Children are first and foremost safely maintained in, or returned to, their homes or the most family-like setting. Services and supports take place in the most inclusive, most integrated, most responsive, most accessible, and least restrictive or most family-like setting appropriate based on the needs of each child.

f. **Culturally Relevant**: Services are culturally relevant and respect the values, preferences, beliefs, culture, and identity of the child/adolescent, family, and community, including specific populations having specialized needs, which include, but are not limited to, BIPOC (Black, Indigenous, and people of color) and LGBTQIA+ populations.

g. **Individualized**: Services and supports are individualized and tailored to the unique strengths and needs of each child and family. They are altered to meet changing needs and goals.

h. **Strengths-based**: Services and supports are planned and delivered in a manner that identifies, builds on, and enhances the capabilities, knowledge, skills, and assets of the child and family, and the strengths of the community and other team members.

i. **Outcome-based**: Based on the family's needs and vision, the team develops goals and strategies, ties them to observable indicators of success, monitors progress in terms of these indicators, and revises the plan accordingly. Services and supports are persistent and flexible to overcome setbacks and achieve goals and outcomes. Safety, stability, and permanency are priorities.

j. **Unconditional Care**: A child and family team's commitment to achieving its goals persists regardless of the child's behavior, placement setting, family circumstances, or availability of services in the community. The team continues to work with the family toward their goals until the services are assessed to be no longer necessary or the family indicates that they are no longer required.

# APPENDIX C



Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

# *Amended Iowa REACH Initiative*

The Implementation Plan for Responsive and Excellent Care for Healthy youth

**June 2024; Amended January, 2025**

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

*Iowa REACH Initiative*................................................................................................................... 1

Introduction......................................................................................................................................... 4

Implementation Plan ........................................................................................................................... 6

    Goal 1: Develop, improve and strengthen the Relevant Services for the Defined Class to effectively meet their individual needs and maximize their success and development in the least restrictive setting. ........... 6

        Objective 1. Engage and communicate with families to inform, educate, and involve youth and their families, providers and child serving agencies in the Iowa REACH Initiative. ......................................... 6

            Strategy 1. Engage families and providers through targeted engagement and education activities to design and implement the Relevant Services in order to improve and strengthen services as part of the Iowa REACH Initiative. ................................................................................................................... 6

            Strategy 2. Develop accessible information about the obligations of this settlement and the plan to provide Relevant Services within the Iowa REACH continuum of care for youth, providers, and child-serving agencies. ..................................................................................................................................... 6

            Strategy 3. Engage child serving individuals and organizations to ensure they are aware of currently available services and supports and upcoming changes and development and implementation of Relevant Services and supports for the Defined Class. ....................................................................... 7

            Strategy 4. Strengthen cultural competency and accessibility through engagement with culturally appropriate organizations in the development and review of materials. ............................................... 7

            Anticipated Outcomes of Objective 1 ............................................................................................... 7

        Objective 2. Effectively identify and determine eligibility for the Relevant Services through a standardized and appropriate assessment tool. ...................................................................................... 7

            Strategy 1. Engage stakeholders through the Iowa REACH Implementation Team to develop a public engagement and decision-making process to decide on the new uniform assessment tool that will be used for Iowa REACH Initiative pathways to care. ................................................................................. 8

            Strategy 2. Ensure consistency and accuracy in screenings and assessments. ................................. 8

            Anticipated Outcomes of Objective 2 ............................................................................................... 8

        Objective 3. Ensure the Relevant Services are available to effectively meet the individualized needs of the Defined Class in the least restrictive and most appropriate setting, prioritizing youth and family voice and choice. ........................................................................................................................................... 9

            Strategy 1. Improve and strengthen educational materials about EPSDT and processes to access the Relevant Services for the Defined Class. ........................................................................................... 9

            Strategy 2. Implement an improved and strengthened care coordination service array that effectively meets the individualized needs of the Defined Class. ......................................................................... 9

            Strategy 3. Develop and strengthen the In-Home and Community-Based Services service array that is individualized and strengths-based aimed to correct or ameliorate behavioral health conditions that interfere with a child's functioning. ................................................................................................... 11

            Strategy 4. Provide services through a Home and Community Based Services 1915 (c) waiver to provide support to the Defined Class in their homes and communities. ............................................. 12

            Strategy 5. Improve, develop and strengthen mobile crisis intervention and stabilization services continuum of care to ensure services are available 24 hours a day, seven days a week, 365 days a year to all children and youth throughout the State at the location where the crisis is occurring. ....... 13

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

Anticipated Outcomes for Objective 3.................................................................................................. 13

Objective 4. Improve and develop provider capacity to ensure access to all necessary Relevant Services for all youth in the Defined Class, including those with specialized needs. ............................ 14

Strategy 1. Implement new policies and innovations to increase provider capacity and meet the needs of youth with specialized needs. ..................................................................................................... 14

Strategy 2: Improve available support and trainings for providers..................................................... 15

Strategy 3. Assess access to care and network adequacy standards. ................................................ 15

Strategy 4. Improve and streamline provider enrollment, contracting, authorization and payment processes.............................................................................................................................................. 15

Anticipated Outcomes for Objective 4................................................................................................. 16

Objective 5. Ensure due process and transparency for Medicaid-eligible youth with behavioral health disorders................................................................................................................................................... 16

Strategy 1. Improve and strengthen current educational materials and requirements related to transparency and due process. .......................................................................................................... 16

Strategy 2. Create structured opportunities for stakeholder engagement to inform the design and implementation of the Iowa REACH Initiative...................................................................................... 17

Strategy 3. Ensure compliance with all legally appropriate, federal and state due process rules and requirements. ...................................................................................................................................... 17

Anticipated Outcomes from Objective 5 ............................................................................................. 17

Goal 2: Develop a quality management and accountability structure that ensures ongoing quality assurance and systems improvement for the Defined Class.................................................................... 17

Strategy 1. Develop and implement an Iowa REACH Initiative Quality Improvement and Accountability (QIA) framework and plan that establishes the approach and elements of performance the state will monitor to determine the quality of the Relevant Services and evaluate whether the Defined Class are achieving improved outcomes............................................................................................................... 17

Strategy 2. Strengthen and improve data collection capacity and processes to support successful implementation of the Quality Improvement and Accountability Plan..................................................... 18

Strategy 3: Develop public reporting mechanisms to demonstrate statewide performance concerning children's behavioral health measures and outcomes for members of the Defined Class...................... 18

Conclusion.................................................................................................................................................. 20

Appendix. ................................................................................................................................................... 21

Current and Proposed Waiver Services for the Defined Class, in addition to EPSDT covered Relevant Services for the Defined Class ............................................................................................................... 21

Existing waiver services (Children's Mental Health waiver)....................................................................... 21

Proposed future waiver services (Children and Youth Waiver) ................................................................. 21

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

# Introduction

**Purpose and vision of the Implementation Plan**

This Implementation Plan is intended to fulfill the obligations of the Interim Settlement Agreement reached on October 2, 2023, in C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA. The plan is designed to serve as a single, integrated implementation plan that outlines the approach the Iowa Department of Health and Human Services (Iowa HHS) will take to improve the delivery of intensive home and community-based behavioral health services to the members of the Defined Class.

Class Members as defined in the Interim Settlement Agreement are:

> All Medicaid-eligible children in the State of Iowa under the age of twenty-one, (i) who have been determined by a licensed practitioner of the healing arts as having a serious emotional disturbance, not attributable to an intellectual or developmental disability, and (ii) for whom there is an assessment that intensive home and community-based services are needed to correct or ameliorate their condition.

The intensive home and community-based behavioral health services covered by the Interim Settlement Agreement include (1) Intensive Care Coordination (ICC), (2) Intensive In-Home and Community Therapeutic Services (IHCTS), (3) Mobile Crisis Intervention and Stabilization Services (MCIS), and (4) Waiver Services to ensure placement in least restrictive setting. This comprehensive intensive service array is referred to as the "Relevant Services." The four services that make up the Relevant Services are defined in detail in Appendix A of the Interim Agreement.

The Iowa HHS mission is to provide high quality programs and services that protect and improve the health and resiliency of individuals, families, and communities.

The Iowa HHS vision and mission are in alignment with the goals of the Interim Settlement Agreement to maximize the success and development of Medicaid-eligible children and adolescents with behavioral health disorders into healthy and independent adults through the delivery of medically necessary community-based behavioral health services.

**Overview of the Implementation Plan**

The Implementation Plan provides a blueprint for improving and strengthening the delivery of intensive home and community-based behavioral health services and implementing quality management and accountability structure that ensures ongoing quality assurance and systems improvement for the Defined Class.

The Implementation Plan is focused on two core goals:

Goal 1: Develop, improve and strengthen the Relevant Services for the Defined Class to effectively meet their individual needs and maximize their success and development in the least restrictive setting.

Goal 2: Develop a quality management and accountability structure that ensures ongoing quality assurance and systems improvement for the Defined Class.

The collection of efforts outlined in the Implementation Plan will be called the Iowa REACH (Responsive and Excellent Care for Healthy youth) Initiative. Iowa HHS will establish the Iowa REACH Implementation Team to provide governance and accountability for the Implementation Plan.

The Implementation Plan is not a detailed work plan. It presents the high-level goals, objectives, strategies, and planned activities for each aspect of the Iowa REACH Initiative in sufficient detail so the Court can determine if the Implementation Plan is reasonably capable of achieving the terms of the Interim Agreement. The strategies will occur in a phased approach over four years leveraging implementation of other state system improvements and Iowa HHS's targeted focus on improving behavioral health services for the Defined Class.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

Iowa HHS, while empowered to enter and implement this Interim Agreement, does not have the legal authority to bind the Iowa General Assembly, which has the authority under the Iowa Constitution and laws to appropriate funds for, and amend laws pertaining to, the State's system of services for the Defined Class. In addition, Iowa HHS may need to seek federal approval of some Medicaid program changes and cannot commit to timelines on behalf of the federal government. Iowa HHS shall make all reasonable efforts to obtain funding and resources to fulfill the terms of this Interim Agreement and will visit with legislators when they are in session to ensure awareness of these tentative agreements.

**Governance Structure**

In this implementation plan, Iowa HHS commits to the creation of an implementation team, with subcommittees on communications, identification of an assessment tool, care coordination, service development and provider capacity, and quality improvement and accountability. The implementation team will be responsible for overseeing the implementation of this plan's commitments. The implementation team will meet monthly to share progress, risks and issues.

The implementation team will include professionals from the Iowa HHS divisions of Medicaid, Behavioral Health, Aging and Disability Services and Family Wellbeing and Protection. Iowa HHS will continue to work with the experts referenced in the Interim Settlement Agreement Requirement 8(a)(iv), along with other experts or consultants as needed.  Iowa HHS staff will provide agendas and relevant materials to the implementation team prior to its monthly meeting.

In addition to the Iowa HHS team and its vendors assigned to this project, Iowa HHS will request participation from providers, stakeholders, youth and their families on the implementation team.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

# Implementation Plan

**Goal 1: Develop, improve and strengthen the Relevant Services for the Defined Class to effectively meet their individual needs and maximize their success and development in the least restrictive setting.**

*Objective 1. Engage and communicate with families to inform, educate, and involve youth and their families, providers and child serving agencies in the Iowa REACH Initiative.[1]*

The strategies and activities described in this part of the Implementation Plan demonstrate the commitment of Iowa HHS to engage youth and their families, providers and partners from child serving agencies in the design and implementation of the Iowa REACH Initiative. This section also describes how the State will improve and strengthen educational materials to support the effective identification and engagement of the Defined Class and those who support them.

Strategy 1. Engage families and providers through targeted engagement and education activities to design and implement the Relevant Services in order to improve and strengthen services as part of the Iowa REACH Initiative.

1. Ongoing Activities.
   a. Create formal opportunities for youth and families to engage in the design and implementation of the Iowa REACH Initiative.
      i. Continue to present updates and opportunities for feedback at Iowa HHS public provider and member townhalls.
      ii. Ensure individuals with lived experience supporting youth with serious emotional disturbances are engaged through the creation of a Consumer Steering Committee.
      iii. Create and advertise public comment opportunities on key program design and implementation plans.
      iv. Engage youth with serious emotional disturbances and their families in structured research and feedback activities including, but not limited to the Needs on Waitlist (NOW) survey, Provider Capacity Assessment being conducted by Mathematica in 2024, as well as leveraging feedback already received and the ongoing feedback from individuals and families with lived experience via Iowa's certified community behavioral health clinic (CCBHC) planning and implementation process and the crisis system evaluation conducted in collaboration with Health Management Associates (HMA).

Strategy 2. Develop accessible information about the obligations of this settlement and the plan to provide Relevant Services within the Iowa REACH continuum of care for youth, providers, and child-serving agencies.

1. Short-term activities (2025)
   a. Develop a communication plan for pre-implementation activities. This plan will include stakeholder engagement to recruit for Iowa REACH Initiative committees and how Iowa HHS will provide the public with updates.
   b. Engage a Communications subcommittee as part of the Iowa REACH Implementation Team. This subcommittee will create a communication plan by working with stakeholders to identify needs and necessary information including but not limited to:
      i. who is intended to be served,
      ii. what services are available,
      iii. how to make a referral or self-referral for a screening,

---

[1] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. b. Beneficiary Information and Service Array, i.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

        iv.  how medical necessity is determined, and
        v.  how youth and family can be involved in governance and due process.
  c.  Engage youth in their own behavioral health and well-being by providing accessible screening and behavioral health resources.
  d.  Ensure information about the Iowa REACH Initiative is accessible and helpful to the public.

2. Ongoing Activities
   a. Implement the comprehensive communications plan to ensure clear communications about systems improvements and changes being implemented in 2026 including, but not limited to, the implementation of the Relevant Services, implementation of the redesigned home and community-based services waiver and the implementation of the Behavioral Health Services System.
   b. Develop a holistic end-to-end toolkit to support case managers and care coordinators in navigating eligibility for the Relevant Services, referral sources and other important information.
   c. Create an online training on Medicaid eligibility and update the training annually, or when any significant eligibility change occurs.

## Strategy 3. Engage child serving individuals and organizations to ensure they are aware of currently available services and supports and upcoming changes and development and implementation of Relevant Services and supports for the Defined Class.

1. Short-term Activities (2025)
   a. Develop an action plan to engage and educate child-serving individuals and agencies including health navigators, school professionals, Iowa HHS staff and juvenile justice program staff.
2. Ongoing Activities (2025-2028)
   a. Conduct ongoing trainings and engagement to ensure clear communications about systems improvements and changes being implemented in 2026 and beyond.
   b. Work collaboratively with youth, providers, and child-serving agencies to gather feedback on communications materials and identify gaps and opportunities for improvement.

## Strategy 4. Strengthen cultural competency and accessibility through engagement with culturally appropriate organizations in the development and review of materials.

1. Short-term Activities (2025)
   a. Develop trainings on cultural competency and accessibility with the Health Equity Office to make available on staff SharePoint sites.
   b. Use results from the Iowa HHS Health Equity Assessment to inform internal cultural competency training needs.
   c. Engage the Iowa REACH Communication Subcommittee with researching best practices from other states surrounding culturally competent communications.

## Anticipated Outcomes of Objective 1

1. Youth, families, providers, and public child-serving agencies are fully informed about the Relevant Services and how to access them.
2. Communications are culturally competent and accessible.
3. Communications are reviewed and improved where necessary on a regular basis.

*Objective 2. Effectively identify and determine eligibility for the Relevant Services through a standardized and appropriate assessment tool.[2]*

To meet the goal of the Interim Agreement of establishing consistent statewide screening, assessment and referral procedures that will facilitate access to medically necessary services for the Defined Class Iowa HHS

---

[2] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. a. Relevant Services, iii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

will implement a uniform comprehensive diagnostic assessment process to determine eligibility for Relevant Services.

Strategy 1. Engage stakeholders through the Iowa REACH Implementation Team to develop a public engagement and decision-making process to decide on the new uniform assessment tool that will be used for Iowa REACH Initiative pathways to care.

1. Short-term Activities (2025)
    a. Create an Assessment Tool Subcommittee of the Iowa REACH Implementation Team and task them with:
        i. Evaluating assessment tool options informed by research conducted by Mathematica.
        ii. Developing proposed care pathways to the Relevant Services for youth based on results from the chosen assessment tool.
        iii. Proposing the ideal business processes and technology systems for the state to implement to ensure all necessary parties have access to the results from the screening tool.
        iv. Providing recommendations on trainings and support for providers.
2. Mid to Long-term Activities (2027-2028)
    a. Implement new screening tool with early adopter providers in 2027.
    b. Fully implement the new screening tools and processes prior to roll-out of the Relevant Services (2027-2028).

Strategy 2. Ensure consistency and accuracy in screenings and assessments.[3]

1. Short-term Activities (2025)
    a. Engage youth, families, providers, managed care organizations (MCOs) and child-serving agencies to develop a consistent approach to identifying and engaging the Defined Class using evidence-informed screening tools.
    b. Develop a training plan to ensure each provider and system partner has received training based on the chosen assessment tool.
2. Mid-term Activities (2026)
    a. Update the appropriate contracts, service and billing manuals with the chosen assessment tool.
    b. Develop and implement universal training for providers.
    c. Develop and implement quality assurance and accountability structures to ensure consistency and accuracy in assessments.
3. Ongoing Activities
    a. Complete annual review of training plan and ensure that training is kept up to date including a way to disseminate changes and updates.
    b. Provide refresher training annually and when there are changes or updates made.

Anticipated Outcomes of Objective 2

1. Consistent statewide screening, assessment and referral processes will facilitate access to the Relevant Services for the Defined Class.
2. Providers and system partners have a thorough and consistent understanding of the assessment tool and necessary training and support to ensure consistency and accuracy in screenings.

---

[3] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. c. Eligibility and Access to Behavioral Health, i.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

*Objective 3. Ensure the Relevant Services are available to effectively meet the individualized needs of the Defined Class in the least restrictive and most appropriate setting, prioritizing youth and family voice and choice.[4]*

This section of the Implementation Plan describes the approach Iowa HHS will take to improve, develop, and strengthen the Relevant Services available to support the Defined Class in the least restrictive setting.

### Strategy 1. Improve and strengthen educational materials about EPSDT and processes to access the Relevant Services for the Defined Class.

1. Short-Term Activities (2025)
   a. Publish EPSDT requirements in an updated pediatric provider manual.
   b. Engage MCOs, child welfare social workers, providers including schools and associations to improve access to, and billing of services provided in Iowa.
   c. Pursue changes to school-based health services to maximize support for the Defined Class.
2. Mid-term Activities (2026)
   a. Clarify and strengthen program oversight and supporting business processes to ensure compliance with EPSDT requirements outlined in contracts and EPSDT requirements of the pediatric provider manual.
   b. Evaluate and improve public education materials for youth, families, providers and child-serving agencies about EPSDT and Medicaid services, as well as prior authorizations for those services.

### Strategy 2. Implement an improved and strengthened care coordination service array that effectively meets the individualized needs of the Defined Class.

1. Short-term Activities (2025)
   a. Improve and develop case management and care coordination services available to the Defined Class.
      i. Engage stakeholders to evaluate Integrated Health Home performance and leverage recommendations to further strengthen care coordination and case management for the Defined Class.
      ii. Take stakeholder recommendations from the review of the IHH evaluation to create a new approach to intensive care coordination for the Defined Class, consistent with the defined Relevant Services.
      iii. Develop and begin to implement trainings through the newly procured Learning Management System.
   b. Create an Intensive Care Coordination (ICC) Subcommittee of Iowa REACH Implementation Team that will:
      i. Design the ICC service model, consistent with the Relevant Services defined in Appendix A of the Interim Agreement.
      ii. Develop proposed care pathways for youth to access ICC based on results from the chosen assessment tool.
      iii. Propose the ideal business processes and technology systems for the Iowa HHS to implement a single point of accountability for ensuring that medically necessary Relevant Services are accessed, coordinated, and delivered. Specifically, describe how intensive care coordination will be provided to the Defined Class as well as when available through the 1915c home and community-based service waiver.
      iv. Provide recommendations on trainings and support for providers.
2. Mid-term activities (2026)

---

[4] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. a. Relevant Services, i and ii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

    a. Establish and make publicly available statewide ICC service standards by July 1, 2026, including the following core components:

        i. **Referral and assessment procedures** that describe how the strengths-based, needs driven, comprehensive assessment is used to organize and guide the development of a family-driven, child-focused, person-centered plan (PCP). The PCP will be developed by a care planning team (CPT) made up of a child and family team that brings together individuals selected by the child and family who are committed to them through informal, formal, and community support and service relationships.

        ii. **Eligibility criteria and procedures** for how a youth will receive ICC from a qualified provider when it is determined to be medically necessary based on the outcome of the assessment process, utilizing an appropriate assessment tool, that determines the needs of the child for medical, educational, social, behavioral health, or other services.

        iii. **Intensive care coordination to youth staffing ratio** (i.e., caseload sizes), the frequency and cadence of face-to-face meetings, and the frequency of CPT meetings to ensure high-quality services can be provided to children and families and prevent turnover and burnout of staff.

        iv. **Expectations for crisis and safety plans** based on the child's history and needs, including a sample structure of a crisis and safety plan to ensure consistency of plan elements across the state.

        v. **Quality and accountability expectations** for how care coordinators will work directly with the child and family to implement elements of the PCP and continually prepare, monitor, and modify the PCP in concert with the CPT.

            1. For youth discharged from residential or institutional settings, or other out-of-home placements, the CPT will identify individualized strategies within the PCP to enable the youth to remain at home and in the community and to prevent readmissions to these institutions or residential settings.[5]

            2. For youth ready to transition out of the Iowa REACH Continuum of Care, expectations for how the care coordinator will work with the child and family and CPT to develop a transition plan once it is determined that the child has achieved the goals of the PCP.

3. Long-Term Activities (2027 and beyond)

    a. Implement the Iowa REACH Initiative ICC model with early adopter providers in 2027.

        i. Review results of early adopter implementation and add support and oversight as needed.

    b. Implement statewide coverage of ICC services by July 1, 2028, through the following activities:

        i. Develop standardized protocols and procedures for provision of services.

        ii. Secure funding to support ICC implementation, as needed.

        iii. Procure necessary services from credentialed trainers to provide training and technical assistance on ICC service standards to ensure consistent, standardized, and high-quality service delivery throughout the state.

        iv. Clarify roles and responsibilities for accessing ICC services in appropriate contracts, provider service and billing manuals.

            1. Train MCOs and fee for service on service access requirement.

---

[5] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. e. Service Delivery in the Least Restrictive Setting, iii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

      2. Ensure documentation and processes to ensure services authorized are timely provided, high quality, medically necessary, appropriate for the child's needs, and within the least restrictive setting.

      3. Make the authorization process review criteria public to ensure transparency, clarity, and efficiency, and compliance with the CMS Interoperability and Prior Authorization Final Rule.

  c. Monitor network adequacy for the Relevant Services.

### Strategy 3. Develop and strengthen the In-Home and Community-Based Services service array that is individualized and strengths-based aimed to correct or ameliorate behavioral health conditions that interfere with a child's functioning.[6]

1. Short-term Activities (2025)
   a. Create a Services and Providers Subcommittee of Iowa REACH Implementation Team and task them to:
      i. By December 31, 2025, design an intensive in-home and community-based service delivery system composed of In-Home and Community-based Supportive and Therapeutic Services (IHCSTS) consistent with best practices and the Relevant Services defined in Appendix A of the Interim Agreement which are aimed to enable the Defined Class to build skills necessary for successful functioning in the home and community and improve the family's or caregiver's ability to help the child successfully function in the home and community.
      ii. Develop proposed care pathways for youth to access IHCSTS based on results from the chosen assessment tool.
      iii. Propose requirements to support furthering the principal of unconditional care.
      iv. Propose the ideal business processes and technology systems for the state to implement these IHCSTS for youth for whom they are determined to be medically necessary.
      v. Provide recommendations on trainings and support for providers.
   b. Create a legislative budget proposal for HCBS waiver redesign that includes alignment of service definitions and limitations and increased access to Respite services.
   c. Increase Respite rates for SFY 2025 with the aim of increasing access.
   d. Identify service gaps to support maintaining the Defined Class in the least restrictive setting.
2. Mid-term Activities (2026)
   a. Establish and make publicly available statewide Intensive In-Home and Community-Based Support and Therapeutic Service standards by July 1, 2026, that:
      i. **Define eligibility criteria and referral processes** for accessing IHCSTS.
      ii. **Identify services that meet IHCSTS** consistent with the Relevant Services defined in Appendix A of the Interim Agreement. This includes identification of the evidence-based practice and corresponding provider qualifications, target population, duration and structure of the services.
      iii. **Describe how IHCSTS services will be delivered** according to the care plan developed by the CPT.
         1. The care plan will identify goals and objectives for all life domains in which the child's behavioral health condition causes impaired functioning, including family life, community life, education, vocation, and independent living, and identifies

---

[6] Interim Settlement Agreement Requirement, Appendix A, Section A, 2. Intensive In-Home and Community-Based Therapeutic Services

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

the specific interventions that will be implemented to meet those goals and objectives.

    iv. **Describe how IHCSTS will be adapted**, in accordance with best practices, to specific populations having specialized needs, which include, but are not limited to, BIPOC (Black, Indigenous, and people of color) and LGBTQIA+ populations.

        1. Adaptations may include consultation with evidence-based practice model developers on protocol modifications to accommodate and be attuned to populations having specialized needs.

    v. **Detail how youth who are discharged** from residential or institutional settings, or other out-of-home placements, receive IHCSTS needed to remain at home and in the community and to prevent readmissions to these institutions or residential settings.

    vi. **Identify the youth to IHCSTS provider capacity requirements** to allow staff to work with children and family with appropriate intensity based on medical necessity.

3. Long-Term Activities (2027 and beyond)

    a. Implement the Iowa REACH IHCSTS model with early adopter providers in 2027.

        i. Start by conducting outreach to providers who can serve geographic areas with the highest population of children in the Defined Class.

    b. Implement statewide coverage of IHCSTS by July 1, 2028, through the following activities:

        i. Develop standardized protocols and procedures for provision of services.

        ii. Provide training and ongoing supervision for IHCSTS staff to ensure adherence to established protocols and best practices.

        iii. Develop and deliver specialized training programs focused on transitional care for both members and their families transitioning from institutional settings to IHCSTS. These training sessions should equip providers with the necessary skills and resources to support successful transitions and ongoing care management.

        iv. Implement practice changes and procedural updates to streamline authorization processes for IHCSTS, allowing for greater flexibility in approving and accessing services in a timely manner based on need.

        v. Streamline administrative processes by eliminating prior authorizations for services that are consistently approved or deemed medically necessary based on evidence-based guidelines. This reduces administrative burden, expedites access to care, and enhances the efficiency of service delivery for the Defined Class.

    c. Monitor network adequacy for the Relevant Services.

### Strategy 4. Provide services through a Home and Community Based Services 1915 (c) waiver to provide support to the Defined Class in their homes and communities.[7]

As part of the HOME project and class action brought by the Defined Class, Iowa HHS is currently planning to develop two new Medicaid waivers—one serving children and youth ages 0 to 20, and one serving adults ages 21 and older that will replace the current seven existing Medicaid waivers. This age-based waiver model will work in conjunction with covered state plan and EPSDT services to support the Defined Class to help them live successfully in the community, including through providing the waiver services defined in in Appendix A of the Interim Agreement.

1. Short-term Activities (2025)

    a. Engage the public to provide input on waiver redesign to ensure waiver services are designed to meet the needs of members of the Defined Class by September 30, 2024.

---

[7] Interim Settlement Agreement Requirement, Appendix A. Section B. Waiver Services to Ensure Placement in the Least Restrictive Setting.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

   i. Conduct tailored outreach to members of the Defined Class, families and caregivers, providers, and advocates as part of waiver redesign communications and public comment processes, including a public comment session specifically on waiver services for the Defined Class.
   b. Prepare redesigned waiver service packages and submit waiver applications to the Center for Medicare and Medicaid Services (CMS) by December 31, 2025.

2. Mid-term Activities (2026, pending approval from the Centers on Medicare & Medicaid (CMS))
   a. Work collaboratively with CMS to gain approval of new home and community-based services waiver services and processes including comprehensive assessment, person-centered planning, service delivery and quality monitoring.
   b. Conduct a public outreach campaign to educate youth, families, and caregivers about the redesigned home and community-based waivers using plain language to describe waivers, the services offered, eligibility requirements and how to apply for the waiver.
   c. Engage service providers and provide technical assistance to optimize enrollment of current providers in redesigned waivers.
   d. Monitor network adequacy for services in redesigned waivers.
   e. Implement operational changes to support transition to the new waiver system in 2025.
   f. Increase priority waiver access for individuals with greatest risk of segregated placements (e.g., psychiatric hospitals, emergency rooms, and psychiatric residential treatment facilities).
      i. Develop and implement needs-based waitlist prioritization algorithm based on assessed need.
      ii. Create reserved capacity slots to ensure timely waiver access for members of the Defined Class with highest need.

## Strategy 5. Improve, develop and strengthen mobile crisis intervention and stabilization services continuum of care to ensure services are available 24 hours a day, seven days a week, 365 days a year to all children and youth throughout the State at the location where the crisis is occurring.[8]

1. Short-term Activities (2025)
   a. Strengthen and improve current crisis services offered through the implementation of Certified Community Behavioral Health Clinic model of care (demonstration application pending with federal partners) and Crisis Response Services including Mobile Crisis, Crisis Evaluation, Crisis Stabilization Community-Based Services and Crisis Stabilization Residential Services based on findings from the current mobile crisis intervention services evaluation efforts conducted by Health Management Associates (HMA).
   b. Iowa Medicaid will engage in and support the transition planning for the Behavioral Health Services System to ensure the needs of the Defined Class are addressed in the enhancement of the existing array of crisis services.
   c. Identify opportunities to improve Medicaid payment processes for crisis services.

2. Long-term Activities (2026)
   a. Ensure new or updated crisis services conform to the Relevant Services defined in Appendix A of the Interim Agreement for the Defined Class.
   b. Implement and monitor Medicaid payment process improvements for crisis services.

## Anticipated Outcomes for Objective 3

1. Establish a foundation for statewide provision of behavioral health services consistent with the Principles under the Interim Settlement Agreement.

---

[8] Interim Settlement Agreement Requirement, Appendix A. Section A. 3. Mobile Crisis Intervention and Stabilization Services.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

2. Develop, establish and maintain a comprehensive service array for each of the Relevant Services in order to provide members of the class with timely access to medically necessary and other home and community-based behavioral health services.

3. Ensure that Medicaid-eligible children receive behavioral health services in the most integrated and least restrictive setting appropriate to their needs and prevent inappropriate and segregated placements.[9]

4. Improve clarity about roles, responsibilities, and processes for ensuring access to the Relevant Services for the Defined Class.

*Objective 4. Improve and develop provider capacity to ensure access to all necessary Relevant Services for all youth in the Defined Class, including those with specialized needs.[10]*

Iowa HHS is committed to improving the capacity of providers to serve youth with a diagnosed serious emotional disturbance. This section of the Implementation Plan outlines the strategies and activities the state will pursue to improve provider capacity to provide all necessary Relevant Services to the Defined Class. Moving forward efforts to improve provider capacity will include alignment between the Iowa Medicaid Managed Care Organizations, Integrated Health Homes, Certified Community Behavioral Health Clinics and the Behavioral Health Services System.

## Strategy 1. Implement new policies and innovations to increase provider capacity and meet the needs of youth with specialized needs.

1. Short-term Activities (2025)
    a. Conduct a Service Access and Provider Capacity Needs Assessment to be completed on October 1, 2025, to thoroughly investigate the Relevant Service needs of the Defined Class with specialized needs, including, but not limited to BIPOC (Black, Indigenous and people of color) and LGBTQIA+ (lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual and more) populations.
    b. Conduct comprehensive internal Health Equity Assessment. This may include document review, key informant interviews, focus groups, and surveys.
    c. Implement new rates identified through the rate review process and approved by the Iowa Legislature and the Center for Medicare & Medicaid services.
    d. Implement new case management ratios and training for Community Based Case Managers with Managed Care Organizations on July 1, 2025.
    e. Evaluate opportunities to change School Health Services Policies to increase the ability for school-based providers to provide services to Medicaid enrolled youth.

2. Mid-term Activities (2026)
    a. Engage Stakeholders around the Needs Assessment Findings in the first quarter of calendar year 2026 to gather recommendations for new policies and innovations to build network capacity for the Relevant Services.
    b. Evaluate opportunities to maximize the use of peer support and community health workers, especially with youth with specialized needs.
    c. Conduct planned rate review no less than annually.
    d. Evaluate tiering or alternative compensation for providers of individuals with higher level of care needs.

3. Long-term Activities (2027 and beyond)
    a. Develop a strategy to do regular needs assessments.

---

[9] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. e. Service Delivery in the Least Restrictive Setting, i and ii.
[10] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. d. Service Delivery and Quality Improvement, iii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

     b. Develop interim goals and numerical benchmarks for service utilization and provider capacity rates.

     c. Continue stakeholder engagement to evaluate the impact of rate increases, payment tiers and other policy or process changes.

## Strategy 2: Improve available support and trainings for providers.

1. Short-term Activities (2025)
   a. Conduct Service Access and Provider Capacity Needs Assessment to be completed on October 1, 2025, to thoroughly investigate the service needs, use and access of the Defined Class with specialized needs, including, but not limited to BIPOC (Black, Indigenous and people of color) and LGBTQIA+ (lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual and more) populations.
   b. Engage with providers through standing workgroups to identify support and training needs and explore new ideas for increase provider capacity.
2. Mid-term Activities (2026)
   a. Develop Learning Management System trainings for providers that includes options for trainings that support provider knowledge, skills, and abilities to serve the Defined Class with specialized needs.
   b. Engage providers to assess the effectiveness of provider training efforts.
3. Long-term Activities (2027 and beyond)
   a. Provide ongoing trainings for providers through the Learning Management System.
   b. Engage providers to assess the effectiveness of provider training efforts.

## Strategy 3. Assess access to care and network adequacy standards.

1. Short-term Activities (2025)
   a. Implement a new reporting template or data feed to better capture and monitor network adequacy for Medicaid Managed Care Organizations and fee-for-service, which will allow Iowa Medicaid to identify gaps in coverage and providers accepting members.
   b. Work collaboratively with Iowa Medicaid vendors and providers to improve data quality and specificity to include adequate information to ensure compliance with access to care and network adequacy standards.
   c. Evaluate compliance and oversight strategies to ensure access to Relevant Services in compliance with federal/state regulation.
   d. Complete EPSDT review to ensure compliance with Federal guidelines.
2. Mid-term activities (2026)
   a. Modify Managed Care Network Geographic Access requirements to align with final Federal Access Rule.
   b. As part of the External Quality Review, include a review of managed care plan compliance with provider directory requirements.
   c. Evaluate potential options to identify providers with skills and experience serving specialized populations.

## Strategy 4. Improve and streamline provider enrollment, contracting, authorization and payment processes.

1. Short-term Activities (2025)
   a. Engage the Services and Providers Subcommittee of Iowa REACH Implementation Team to evaluate opportunities to streamline provider enrollment, credentialing and contracting requirements and processes including, but not limited to
      i. Provider enrollment processes.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

      ii.  Provider screening requirements, including background checks by reliance on Medicare, other state Medicaid and state licensing boards.
      iii.  Prior authorization requirements and processes.
      iv.  Maintaining provider information on the use of evidence-based practices.

  b.  Improve communications and educational materials to support providers and communicate about any changes to provider enrollment, credentialing, and contracting requirements.

2. Mid-term Activities (2026)
  a.  Implement changes identified by the Providers and Services subcommittee to facilitate provider enrollment and contracting process to reduce administrative burden and streamline processes.
  b.  Determine sufficient provider capacity to provide Relevant Services to the Defined Class, as medically necessary, statewide.

3. Long-term Activities (2027 and beyond)
  a.  Implement a new Provider Enrollment Portal.
  b.  Ongoing development of sufficient provider capacity to provide Relevant Services to the Defined Class, as medically necessary, statewide.

## Anticipated Outcomes for Objective 4

1. Implemented systemic changes to ensure the services and supports that are necessary to maximize the success and development of Medicaid-eligible youth are timely provided. Sufficient qualified provider capacity to meet the Relevant Service needs of the Defined Class.
2. Stronger support and engagement with providers through streamlined administration and trainings.
3. Identify and develop plans to address the needs of populations with specialized needs.

## Objective 5. Ensure due process and transparency for Medicaid-eligible youth with behavioral health disorders.[11]

Iowa HHS is committed to ensuring due process and transparency related to services available for the Defined Class. This part of the Implementation Plan describes how the eligibility criteria, assessment tool(s), and utilization review criteria will be disclosed, including the processes, strategies, evidentiary standards, and other factors used to determine eligibility for or limitation of behavioral health services.

## Strategy 1. Improve and strengthen current educational materials and requirements related to transparency and due process.

1. Short-Term Activities (2025)
  a.  Review and improve information currently available for members on eligibility and services available through the state plan, EPSDT benefit, HCBS waiver via welcome packets, and fee-for-service (FFS) and MCO handbooks.
  b.  Work with stakeholders to ensure notices of action (NOA) and other service decision documents clearly communicate meaning of the decision and next steps for members, providers, and case managers.
  c.  Review Notice of Adverse Benefit Determination (NOADB), grievance and appeal procedures to ensure notice and appeal rights exist when services are denied, terminated or delayed.
  d.  Improve current information about eligibility and utilization review criteria and due process requirements for existing services for the Defined Class through clear contract requirements, provider, and service manuals.

---

[11] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. c. Eligibility and Access to Behavioral Health, ii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

## Strategy 2. Create structured opportunities for stakeholder engagement to inform the design and implementation of the Iowa REACH Initiative.

1. Short-Term Activities (2025)
   a. Engage youth, families, providers, and child-serving agencies in the work of the Assessment Tool subcommittee to ensure transparency and engagement in the process to choose a uniform assessment tool and develop care pathways for the Defined Class.
   b. Engage youth, families, providers, and child-serving agencies in the work of the Services and Provider Subcommittee to ensure transparency and engagement in the design and implementation of services through the Iowa REACH Initiative.

## Strategy 3. Ensure compliance with all legally appropriate, federal and state due process rules and requirements.

1. Short-Term Activities (2025)
   a. Review and ensure the state has all required due process and transparency requirements in contracts and provider manuals.
2. Ongoing Activities
   a. Review and update due process and transparency requirements as federal and state rules and regulations change.
   b. Monitor contractors and providers for compliance with due process and transparency requirements.

## Anticipated Outcomes from Objective 5

1. Increase transparency and understanding of Medicaid eligibility and service authorization policies and procedures.
2. Medicaid beneficiaries (including Defined Class members) are aware of their due process rights and the due process policies and procedures so they can exercise their rights.

## Goal 2: Develop a quality management and accountability structure that ensures ongoing quality assurance and systems improvement for the Defined Class.

This section of the Implementation Plan describes the strategies and activities that Iowa HHS will undertake to ensure ongoing quality assurance and systems improvement on behalf of members of the Defined Class and their families.

Monitoring the impact of the systems changes and ensuring ongoing continuous improvement in the system will require Iowa HHS to identify and develop quality management tools and measures to monitor, provide, and improve the quality of care and to provide transparency and accountability to, and the involvement of families, children and invested stakeholders.

## Strategy 1. Develop and implement an Iowa REACH Initiative Quality Improvement and Accountability (QIA) framework and plan that establishes the approach and elements of performance the state will monitor to determine the quality of the Relevant Services and evaluate whether the Defined Class are achieving improved outcomes.[12]

1. Short-term Activities (2025)
   a. Establish a subcommittee as part of the Iowa REACH Implementation Team with representatives from child-serving agencies, state agencies, counties and providers that deliver care to the Defined Class.
   b. Review and compare quality assurance and accountability approaches and measures among workgroup participants.

---

[12] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8. d. Service Delivery and Quality Improvement, ii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

    c. Develop a collaborative QIA Plan that establishes the approach and expectations for continuous quality improvement and accountability and identifies key performance measures for the Iowa REACH Initiative by December 31, 2025.

2. Mid-term Activities (2026)
    a. Work collaboratively with child-serving agencies, state agencies, counties and providers to prepare for the formal launch of the QIA Plan on July 1, 2026, in alignment with the launch of the Behavioral Health Services System and the redesigned Medicaid HCBS waiver structure.

3. Long-term Activities (2027).
    a. Annually review and update the QIA Plan to align the key performance indicators for strengthened and improved services as they are implemented.

*Strategy 2. Strengthen and improve data collection capacity and processes to support successful implementation of the Quality Improvement and Accountability Plan.[13]*

Improving data collection capacity and process will be key to ensuring Relevant Services are provided to the Defined Class Consistent with the requirements of the Interim Agreement, the below strategies will support Iowa HHS to improve the collecting, tracking, analyzing, and using claims and encounter data, utilization data, and expenditure data to determine how well the system is performing.

1. Short-term Activities (2025)
    a. Evaluate the current data collection capacities and processes for data elements identified in the QIA Plan to determine what data is missing or not available and needed.
        i. Develop consistent definitions and terms for all elements identified in the Quality Improvement and Accountability Plan.
        ii. Define baseline infrastructure for collecting all needed data elements.

2. Mid-term Activities (2026)
    a. Make changes to key data collection activities to build capacity and improve data quality.
    b. Define and execute new contract requirements among child serving providers and relevant contractors who will provide data elements included in the QIA Plan.
    c. Develop new internal processes for cleaning, managing and analyzing the data elements in the QIA.
    d. Develop data governance rules and data dictionaries in alignment with the launch of the Behavioral Health Services System and the redesigned Medicaid HCBS waiver structure.

3. Long-term activities (2027)
    a. Build any new required systems infrastructure to support the ongoing collection and management of data elements in the QIA Plan.

*Strategy 3: Develop public reporting mechanisms to demonstrate statewide performance concerning children's behavioral health measures and outcomes for members of the Defined Class.[14]*

Iowa HHS has developed and will continue to maintain a publicly available data dashboard, updated quarterly. As systems changes are implemented the dashboard will be updated to show statewide performance concerning children's behavioral health measures, including the utilization of the Relevant Services. As required by the Interim Settlement Agreement data made available to the public will include:

- The characteristics of children screened/assessed and determined eligible for Relevant Services, the specific behavioral health services children are receiving, how much of each service they are receiving, who is receiving these services (e.g., child welfare involved children, et al.),

---

[13] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8 f. Data Collection, I and g. Reporting and Monitoring of Implementation Plan, i.
[14] Interim Settlement Agreement Requirement, Section B. Implementation Plan 8 f. Data Collection, ii and g. Reporting and Monitoring of Implementation Plan, ii.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

- The timeliness with which children receive each service, the locations in which children receive behavioral health services, the availability of behavioral health services in the least restrictive setting appropriate to children's needs, the scope and intensity (e.g., how many hours per month and how long) of each of the services,
- The outcomes for children and families, average monthly cost per child, and average monthly service utilization per child.

The following activities will support quality improvement and accountability.

1. Short-term Activities (2025)
   a. Evaluate current data dashboards for gaps based on public reporting requirements of settlement agreement.
   b. Engage individuals with lived experience, families, providers and other stakeholders to provide feedback on important data for public dashboard reporting.
   c. Develop templates for quarterly reporting on data elements required by the Interim Settlement Agreement and within the Quality Improvement and Accountability Plan.
   d. Develop strategies for sharing public reports with all interested stakeholders.
2. Mid-term activities (2026)
   a. Publish new dashboards and reports.
   b. Align public reporting plans with the new Behavioral Health Services System and the redesigned Medicaid HCBS waiver structure.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

# Conclusion

Iowa HHS anticipates that it will successfully execute on the Goals and Objectives outlined in this Implementation Plan, and any other requirements outlined in a final Settlement Agreement, and through successful execution will demonstrate the state has substantially complied with the requirements to improve the delivery of intensive home and community-based behavioral health services for the Defined Class.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

# Appendix.

## CURRENT AND PROPOSED WAIVER SERVICES FOR THE DEFINED CLASS, IN ADDITION TO EPSDT COVERED RELEVANT SERVICES FOR THE DEFINED CLASS

### Existing waiver services (Children's Mental Health waiver)

- Respite: Services provided to the member that give temporary relief to the usual caregiver and provide all the necessary care that the usual caregiver would provide during that period.
- Environmental Modifications and Adaptive Devices: Items installed or used within the member's home that address specific, documented health, mental health, or safety concerns. Limited to additional services not otherwise covered under the state plan, including EPSDT.
- In-Home Family Therapy: Skilled therapeutic services to the member and family that will increase their ability to cope with the effects of serious emotional disturbance on the family unit and the familial relationships.
- Family and Community Support Service: Services provided in the home with the family or in the community with the child; practicing and implementing coping strategies identified by mental health therapists, including through In-home Family Therapy. Practical application of the skills and interventions that will allow the family and child to function more appropriately.
- Medical Day Care for Children: Supervision and support of children (aged 0-18) residing in their family home who, because of their complex medical or complex behavioral needs, require specialized exceptional care that cannot be served in traditional childcare settings.

### <u>Proposed</u> future waiver services (Children and Youth Waiver)[15]

- Daily Activities and Care
  - Home-Delivered Meals
  - Medical Day Care for Children
  - Respite
  - Supported Community Living
  - Transportation
- Help with Health Needs
  - Positive Behavioral Support and Consultation
  - Family and Community Support Service
  - Interim Medical Monitoring and Treatment
  - In-Home Family Therapy
- Equipment and Modifications
  - Assistive Devices
  - Enabling Technology for Remote Support
  - Home and Vehicle Modifications
  - Personal Emergency Response System
- Day Services
  - Day Habilitation
  - Prevocational Services and Supported Employment
- Residential-Based Supported Community Living
- Self-Direction Supports

---

[15] Note: the proposed future child and youth waiver would serve children with a range of disabilities/diagnoses, including SED. A child with SED would not necessarily be eligible for ALL services listed here—services would be approved as part of the individual's care plan, based on their need for the service.

Settlement Agreement – Appendix C
C.A. v. Garcia, case number 4:23-cv-00009-SHL-HCA
United States District Court for the Southern District of Iowa

- o Financial Management Service
  - o Independent Support Broker
  - o Independent Directed Goods and Services
- Other Services
  - o Community Transition Services
  - o Crisis Planning and Support
  - o Peer Mentoring